**J.S. Held Management LLC Equity Incentive Plan**
**Restricted Incentive Unit Grant Agreement**

This Incentive Unit Grant Agreement (the "Agreement"), dated as of September 29, 2016, by and among J.S. Held Management LLC, a Delaware limited liability company (the "Company"), United States Heath and Environmental Liability Management, LLC, a Louisiana limited liability company ("Grantee"), and Tracey Dodd ("Dodd") evidences the grant of Restricted Incentive Units relating to Class B Common Units of the Company to the Grantee in connection with that certain Asset Purchase Agreement, dated as of the date hereof, by and among J.S. Held LLC, the Grantee, Dodd and Thomas Sumner (the "Purchase Agreement"), and the services to be provided by Dodd as contemplated therein, and pursuant to the J.S. Held Management LLC Equity Incentive Plan (the "Plan"). Capitalized terms not otherwise defined herein shall have the meaning assigned in the Plan. The Restricted Incentive Units issued to the Grantee under this Agreement are granted on the following terms and conditions:

1.     Name of the Grantee: United States Heath and Environmental Liability Management, LLC

2.     Number of Class B Common Units Subject to this Grant: 262,774

3.     Date of Grant: September 29, 2016

4.     Vesting Commencement Date (if blank, same as Date of Grant): September 29, 2016

5.     Grant Date Fair Market Value Per Class B Common Unit: $1.37

6.     Vesting of Grant.

     (a)     Except as otherwise expressly provided in this Section 6, provided that Dodd has not had a Separation from Service on or before any such vesting date, the Restricted Incentive Units subject to this Agreement shall vest as follows:

          (i)     Twenty percent (20%) of the Restricted Incentive Units subject to this Agreement shall vest on the first anniversary of the Vesting Commencement Date;

          (ii)     An additional twenty percent (20%) of the Restricted Incentive Units subject to this Agreement shall vest on the second anniversary of the Vesting Commencement Date;

          (iii)     An additional twenty percent (20%) of the Restricted Incentive Units subject to this Agreement shall vest on the third anniversary of the Vesting Commencement Date;

          (iv)     An additional twenty percent (20%) of the Restricted Incentive Units subject to this Agreement shall vest on the fourth anniversary of the Vesting Commencement Date; and

          (v)     An additional twenty percent (20%) of the Restricted Incentive Units subject to this Agreement shall vest on the fifth anniversary of the Vesting Commencement Date.


**EXHIBIT #1**

If the foregoing vesting schedule would produce the vesting of fractional Restricted Incentive Units, the number of Restricted Incentive Units vesting on such date shall be rounded down to the nearest whole Restricted Incentive Unit and vest on the next successive vesting date that, when added to other fractional Units scheduled to vest, will result in the vesting of a whole Restricted Incentive Unit.

(b)     The Committee may, in its sole discretion, take any actions with respect to the Restricted Incentive Units as the Committee deems necessary or appropriate in its sole discretion, consistent with this Agreement, the Plan and the Operating Agreement.

(c)     The period from the Date of Grant until all of the Restricted Incentive Units granted hereunder are vested shall be the "Restriction Period."  Unless the Committee, in its sole discretion, approves otherwise during the Restriction Period, the Restricted Incentive Units granted hereunder may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of by the Grantee.  The Grantee may transfer the Restricted Incentive Units granted hereunder during the Restriction Period only with the express written approval of the Committee and any attempt to sell, assign, transfer, pledge, hypothecate or otherwise dispose of the Restricted Incentive Units contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the Restricted Incentive Units, shall be null and void *ab initio* and without force or effect. Notwithstanding the foregoing, the Grantee shall be permitted to transfer and distribute all or a portion of the Class B Common Units subject to this Agreement to Dodd; provided, that, Dodd agrees to be bound by all of the terms and conditions of this Agreement, including, for the avoidance of doubt, the restrictions on transfer in the preceding sentence.  Notwithstanding the above, if and to the extent that any taxes are due by the Grantee with respect to the Incentive Units upon vesting of the Incentive Units, and if such taxes are not otherwise covered by tax distributions made under the Operating Agreement, the Grantee shall have the right to tender to the Company, and the Company shall repurchase, Unrestricted Incentive Units with a Fair Market Value at the time of such repurchase equal to the amount of taxes due (as determined by the Committee); provided that (i) the Company shall have no obligation to repurchase more than one-half of the Unrestricted Incentive Units held by Grantee and (ii) the Company shall have no obligation to repurchase any Incentive Units to the extent not permitted under any credit facility or similar arrangement of the Company or its Affiliates or Subsidiaries.

(d)     Notwithstanding anything to the contrary contained herein, subject to Section 6(g), if Dodd has a Separation from Service by the Company or any of its Affiliates or Subsidiaries without Cause, all unvested Restricted Incentive Units shall immediately and automatically vest to the Grantee.  The Operating Agreement shall promptly thereafter be updated to reflect the vesting of such Restricted Incentive Units.  "Cause" shall have the meaning ascribed to such term in that certain Employment Agreement, dated as of the date hereof, by and between J.S. Held LLC and Dodd.

(e)     Notwithstanding anything to the contrary contained herein, if Dodd has a Separation from Service for any reason other than as set forth in Section 6(d), vesting shall cease, and any Restricted Incentive Units subject to this Agreement shall be forfeited on such date.  The Operating Agreement shall promptly thereafter be updated to reflect the forfeiture of such Restricted Incentive Units.

(f)    Notwithstanding anything to the contrary contained herein, if Dodd has a Separation from Service by the Company or any of its Affiliates or Subsidiaries for Cause, or Dodd has at any time before or after her Separation from Service breached any covenant in the Purchase Agreement, the Operating Agreement or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition or non-solicitation covenant or agreement with the Company or any of its Affiliates or Subsidiaries during the periods referenced in such agreement, any Unrestricted Incentive Units held by the Grantee and subject to this Agreement shall be forfeited on such date. The Operating Agreement shall promptly thereafter be updated to reflect the forfeiture of such Unrestricted Incentive Units.

7.    <u>Covenants and Agreements of Grantee</u>.  The Grantee and Dodd hereby acknowledge, agree and confirm that, upon signing this Agreement, the Grantee and Dodd are hereby bound by the terms, conditions, covenants, obligations, restrictions and agreements contained in Article XI of the Operating Agreement and <u>Annex C</u> hereto (collectively, the "<u>Covenants Agreement</u>").  The Grantee and Dodd further acknowledge and agree to execute any document or agreement that the Committee deems necessary from time to time as evidence that the Grantee and Dodd are bound by the Covenants Agreement.  The Grantee and Dodd hereby acknowledge that the Incentive Units being granted herein constitute adequate and sufficient consideration in support of the Covenants Agreement and that the Covenants Agreement shall inure to the benefit of, and be enforceable by, the Company and any successor thereto or assign thereof.  For the avoidance of doubt, the Grantee and Dodd agree that neither any transaction nor the fact that the Incentive Units may be forfeited shall affect the Covenants Agreement, and that the Covenants Agreement shall survive any transaction, forfeiture of Incentive Units, or termination of employment or service and shall terminate only in accordance with the provisions in the Operating Agreement and <u>Annex C</u> hereto.  Notwithstanding the foregoing,  in the event Dodd has entered into an employment or consulting agreement with the Company, its Subsidiaries or its Affiliates, and such employment or consulting agreement contains certain covenants and restrictions that conflict with the Covenants Agreement, the covenants and restrictions set forth in such employment or consulting agreement shall govern.

8.    <u>Distributions; Issuance of Incentive Units</u>.

(a)    During the Restriction Period, the Grantee shall receive any distributions with respect to Unrestricted Incentive Units and Restricted Incentive Units as provided in the Plan and the Operating Agreement.  In the event of a distribution payable in Incentive Units or other property or a reclassification, split-up or similar event with respect to Incentive Units during the Restriction Period, the Incentive Units or other property issued or declared with respect to the Restricted Incentive Units shall be subject to the same terms and conditions and forfeiture provisions relating to vesting as the Restricted Incentive Units to which they relate.

(b)    The obligations of the Company with respect to the Incentive Units under the Plan and this Agreement shall be subject to all applicable laws, rules and regulations and such approvals by governmental agencies as may be deemed appropriate by the Committee, including such actions as Company counsel shall deem necessary or appropriate to comply with relevant securities laws and regulations.  The Company may require that the Grantee represent that the Grantee is holding the Incentive Units for the Grantee's own account and not with a view to, or for sale in connection with, any distribution of the Incentive Units, or such other representation as the Committee deems appropriate.

9.   <u>Withholding</u>.  The Grantee shall be required to pay to the Company or its Affiliate or Subsidiary, as the case may be, or make other arrangements satisfactory to the Company or its Affiliate or Subsidiary to provide for the payment of, any federal, state, local or other taxes that the Company or its Affiliate or Subsidiary is required to withhold with respect to the Incentive Units.

10.   <u>Grant Subject to Plan Provisions</u>.  The Grantee and Dodd hereby acknowledge receipt of a copy of the Plan attached hereto as <u>Annex B</u> as presently in effect.  All terms and conditions of the Plan are incorporated herein by reference.  The grant is subject to the provisions of the Plan and to interpretations, regulations and determinations concerning the Plan established from time to time by the Committee in accordance with the provisions of the Plan, including, but not limited to, provisions pertaining to (a) rights and obligations with respect to withholding taxes, (b) the registration, qualification or listing of the Incentive Units, (c) changes in capitalization of the Company and (d) other requirements of applicable law.  The Committee shall have the authority to interpret and construe the grant pursuant to the terms of the Plan and this Agreement, and its decisions shall be conclusive as to any questions arising hereunder.

11.   <u>Tax Consequences</u>.  The Grantee and Dodd have reviewed with the Grantee's and Dodd's own tax advisors the federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Agreement.  The Grantee and Dodd are each relying solely on such advisors and not on any statements or representations of the Company, its Subsidiaries or any of their Affiliates or agents.  The Grantee and Dodd understand that the Grantee and Dodd (and neither the Company nor any of its Affiliates or Subsidiaries) shall be responsible for the Grantee's and Dodd's respective tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.  The Grantee acknowledges that, in accordance with the Plan, the Grantee is required to make a timely election under Section 83(b) of the Code, and that the Grantee will be considered the owner of the Restricted Incentive Units for tax purposes upon making such election and will be subject to tax on the Grantee's share of the Company's income without regard to vesting.  The Grantee understands that Section 83 of the Code taxes as ordinary income the difference, if any, between the amount paid for the Restricted Incentive Units and the fair market value of the Restricted Incentive Units as of the date any restrictions on the Incentive Units lapse pursuant to Section 6 of this Agreement.  <u>*The Grantee understands that the Grantee's election under Section 83(b) of the Code must be filed with the Internal Revenue Service within 30 days from the date that the property is transferred to the Grantee and a copy of such election must be provided to the Company*</u>.  The form for making this election is attached as <u>Annex A</u> hereto.

**THE GRANTEE ACKNOWLEDGES THAT IT IS THE GRANTEE'S SOLE RESPONSIBILITY AND NOT THE COMPANY'S OR ITS AFFILIATES' OR SUBSIDIARIES' TO TIMELY FILE THE ELECTION UNDER SECTION 83(b), EVEN IF THE GRANTEE REQUESTS THE COMPANY, ITS AFFILIATES OR SUBSIDIARIES OR THEIR REPRESENTATIVES TO MAKE THIS FILING ON THE GRANTEE'S BEHALF.**

The Grantee agrees to comply with any valuation determination that the Company or an Affiliate or Subsidiary makes with regard to or affecting the Restricted Incentive Units, including, without limitation, the Grant Date Fair Market Value set forth in Section 5.

12.   <u>Other Restrictions on Sale or Transfer of Incentive Units</u>.

(a)   The Grantee is acquiring the Incentive Units underlying this Agreement solely for investment purposes, with no present intention of distributing or reselling any of the

Incentive Units or any interest therein.  The Grantee acknowledges that the Incentive Units have not been registered under the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

(b)     The Grantee is aware of the applicable limitations under the Securities Act and under the Plan and the Operating Agreement relating to a subsequent sale, transfer, pledge or other assignment or encumbrance of the Incentive Units.  The Grantee further acknowledges that the Incentive Units must be held indefinitely unless they are subsequently registered under the Securities Act and applicable state securities laws or an exemption from such registration is available.

(c)     The Grantee will not sell, transfer, pledge, donate, assign, mortgage, hypothecate or otherwise encumber the Incentive Units underlying this grant unless the Incentive Units are registered under the Securities Act or the Company is given an opinion of counsel reasonably acceptable to the Company that such registration is not required under the Securities Act.

(d)     The Grantee realizes that there is no public market for the Incentive Units underlying this grant, that no market may ever develop for them, and that they have not been approved or disapproved by the Securities and Exchange Commission or any governmental agency.

13.     <u>Operating Agreement; Repurchase Right</u>.

(a)     The Grantee hereby acknowledges, agrees and confirms that upon signing this Agreement, the Grantee is hereby deemed to be a party to and, as a condition of receiving the Incentive Units, bound by the terms, conditions and obligations contained in the Operating Agreement attached hereto as <u>Annex D</u>.  The Incentive Units shall be subject to (i) the repurchase rights contained in the Operating Agreement as in effect on the date of the Agreement, (ii) the other terms and conditions set forth in the Operating Agreement (as amended from time to time), and (iii) the terms and conditions as are described in the Plan, this Agreement, the Purchase Agreement and any employment or similar agreement between the Grantee or Dodd, on one hand, and the Company or any of its Subsidiaries or Affiliates, on the other hand.  The Grantee further acknowledges and agrees to execute any document or agreement that the Board deems necessary from time to time as evidence that the Grantee is a party to and bound by the terms, conditions and obligations contained in the Operating Agreement.

(b)     If Dodd has a Separation from Service for any reason, the Grantee's Incentive Units shall be subject to the terms of the Incentive Unit Purchase Right set forth in Section 4 of the Plan or Section 10.04 of the Operating Agreement as in effect on the date of the Agreement as if the Grantee has had a Separation from Service.  Notwithstanding the provisions of this Section 13(b), the provisions related to repurchase rights set forth in Section 10.04 of the Operating Agreement as in effect on the date of the Agreement with respect to the Incentive Units shall apply to the extent inconsistent with the Plan or the Operating Agreement (as amended from time to time).  The Incentive Unit Purchase Right shall continue to apply to all successor, assignee and transferee holders of the Incentive Units granted hereunder.

14.     <u>No Member Rights</u>.  The Grantee hereby acknowledges, agrees and confirms that, upon the Grantee's execution of this Agreement, the Grantee will be deemed to have ratified and become bound by the provisions of the Operating Agreement, which provisions shall be deemed to have

been incorporated herein by reference.  In addition, subject to Section 8(a), the Grantee hereby further acknowledges, agrees and confirms that the Grantee shall have none of the rights and privileges of Members with respect to an Incentive Unit until the date that the Incentive Unit becomes vested and that upon request of the Board, the Grantee shall execute a counterpart signature page or joinder (or similar instrument) to the Operating Agreement, as in effect from time to time, or any other agreement that the Board deems necessary from time to time, which may include restrictions on the transfer of Incentive Units, drag-along rights and other rights protective of other Members and the Company.

15.   <u>Assignment and Transfers</u>.  Except as the Committee may otherwise permit pursuant to the Plan and the Operating Agreement, and except as set forth in Section 6(c) hereof, the rights and interests of the Grantee under this Agreement may not be sold, assigned, encumbered or otherwise transferred.  In the event of any attempt by the Grantee to alienate, assign, pledge, hypothecate or otherwise dispose of the Incentive Units, except as provided for in this Agreement or the Plan, or in the event of the levy or any attachment, execution or similar process upon the rights or interests hereby conferred, the Company may terminate this Agreement by notice to the Grantee, and the grant and all rights hereunder shall thereupon become null and void.  Any permitted successors, assignees or transferees of the Incentive Units granted hereby shall be fully bound by the terms and conditions set forth in this Agreement and the Plan as if it were a party hereto and thereto.  The rights and protections of the Company hereunder shall extend to any successors or assigns of the Company and to the Company's parents, Subsidiaries and Affiliates.  This Agreement may be assigned by the Company without the Grantee's consent.

16.   <u>Entire Agreement; Amendment of Agreement; Acceptance of Agreement</u>.

(a)   The Grantee hereby acknowledges, understands and agrees that, by signing this Agreement, the Grantee voluntarily and irrevocably forfeits any and all rights, title and interest the Grantee has or may have had in, to and under (i) any equity award, agreement, letter or similar document pursuant to which the Company (or any Subsidiary, Affiliate or predecessor thereof) may have previously granted, or offered to grant, incentive equity in the Company (or any Subsidiary or Affiliate thereof) to the Grantee and (ii) any oral or written commitment or promise regarding incentive equity that the Company (or any Subsidiary, Affiliate or predecessor thereof) may have made to the Grantee.

(b)   Except as otherwise provided herein and notwithstanding anything to the contrary in the Plan, any provision of this Agreement may be amended and waived with the prior written consent of the Company and either (i) the Grantee or (ii) Plan participants who have been granted a majority of the Incentive Units under the Plan (based on the number of Incentive Units subject to all outstanding Unit Awards) theretofore granted under the Plan (unless the Grantee will be treated in a manner different from other Plan participants, in which case the Grantee's written consent will also be required).

(c)   The Grantee acknowledges and agrees that if the Grantee does not accept the grant described in this Agreement by executing and delivering a copy of the Agreement to the Company, without altering or changing the terms thereof in any way, within 30 days of receipt by the Grantee of a copy of the Agreement, the Committee may, in its sole discretion, withdraw its offer and cancel the grant and the Incentive Units subject thereto at any time prior to the Grantee's delivery to the Company of a copy of the Agreement executed by the Grantee.

17. <u>Applicable Law</u>.  The validity, construction, interpretation and effect of this instrument shall be governed by, and determined in accordance with, the laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof.

18. <u>Notice</u>.  Any notice to the Company provided for in this instrument shall be addressed to the Company c/o Lovell Minnick Partners, Radnor Financial Center, 150 N. Radnor Chester Rd, Suite A200, Radnor, PA 19087, Attention: Jason S. Barg, and any notice to the Grantee shall be addressed to such Grantee at the Grantee's then-current address shown on the records of the Company or its Affiliate or Subsidiary, as applicable, or to such other address as the Grantee may designate to the Committee in writing.  Any notice shall be delivered by hand, sent by telecopy, sent by overnight courier that provides for tracking of delivery, or enclosed in a properly sealed envelope, addressed as stated above, registered and deposited, postage prepaid, in a post office regularly maintained by the United States Postal Service.

19. <u>No Employment or Other Rights</u>.  Nothing in the Plan or this Agreement shall confer upon the Grantee or Dodd any right to continue in the employ or service of the Company or any of its Subsidiaries or Affiliates, or interfere in any way with the right of the Company or any of its Subsidiaries or Affiliates to terminate such employment or service at any time for any reason whatsoever (whether for cause or without cause) without liability to the Company or any of its Subsidiaries or Affiliates.

The Grantee hereby accepts the Incentive Unit grant described in this Agreement.  The Grantee acknowledges, agrees and confirms that she has read the Plan and the Operating Agreement and agrees to be bound by the terms of the Plan, the Operating Agreement and this Agreement.  The Grantee further acknowledges, understands and agrees that all of the decisions and determinations of the Committee shall be final and binding.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF,

**J.S. HELD MANAGEMENT LLC**

By: _____

Name:   Jonathon C. Held
Title:    President


Accepted and Agreed:

**UNITED STATES HEATH AND ENVIRONMENTAL
LIABILITY MANAGEMENT, LLC**


By: _____
Name:
Title:


_____

TRACEY DODD


Attachments:        Annex A (Section 83(b) Election Form)
                    Annex B (J.S. Held Management LLC Incentive Plan)
                    Annex C (Covenants Agreement of Grantee)
                    Annex D (J.S. Held Management LLC Operating Agreement)

IN WITNESS WHEREOF,

**J.S. HELD MANAGEMENT LLC**

By:      _____
Name:   Jonathon C. Held
Title:    President

Accepted and Agreed:

**UNITED STATES HEATH AND ENVIRONMENTAL
LIABILITY MANAGEMENT, LLC**

By: _____
Name: _____
Title: _____

_____
TRACEY DODD

Attachments:        Annex A (Section 83(b) Election Form)
                    Annex B (J.S. Held Management LLC Incentive Plan)
                    Annex C (Covenants Agreement of Grantee)
                    Annex D (J.S. Held Management LLC Operating Agreement)

**<u>ANNEX A</u>**

SECTION 83(b) ELECTION FORM

(*See Attached*)

**INSTRUCTIONS FOR FILING SECTION 83(b) ELECTION**

Attached is a form of election under Section 83(b) of the Internal Revenue Code.  As a condition to your receipt of Incentive Units, you must complete, sign and date the election and then proceed as follows:

1.  Execute three counterparts of your completed election (plus one extra counterpart for each person other than you, if any, who receives property that is the subject of your election), retaining at least one photocopy for your records.

2.  Send one counterpart to the Internal Revenue Service Center with which you will file your federal income tax return for the current year via certified mail, return receipt requested.  THE ELECTION SHOULD BE SENT IMMEDIATELY, AS YOU ONLY HAVE 30 DAYS FROM THE DATE THE PROPERTY WAS TRANSFERRED TO YOU WITHIN WHICH TO MAKE THE ELECTION – NO WAIVERS, LATE FILINGS OR EXTENSIONS ARE PERMITTED.

3.  Deliver one counterpart of the completed election to the Company for its files.

4.  If anyone other than you (*e.g.*, one of your family members) will receive property that is the subject of your election, deliver one counterpart of the completed election to each such person.

5.  Attach one counterpart of the completed election to your federal income tax return for this year when you file that return next year.

A--2

_____, 2016

<u>**VIA CERTIFIED MAIL**</u>

Internal Revenue Service Center
**[Insert location where federal tax return is filed]**

*Re:*      <u>*Filing of 83(b) Election*</u>

To Whom It May Concern:

Enclosed for filing as of _____, 2016 (the postmark of this package) is an 83(b) election for taxpayer _____, social security number _____.

Kindly (i) accept the 83(b) election for filing effective today, (ii) date-stamp the enclosed copies of this letter and of the 83(b) election as evidence of such filing, and (iii) return the date-stamped copies of the letter and of the 83(b) election to me in the enclosed self-addressed stamped envelope.  Thank you.

Sincerely,

_____

Address: _____
_____
_____
_____

A--3

## Section 83(b) Election Form

This election is being made under Section 83(b) of the Internal Revenue Code of 1986, as amended, pursuant to Treasury Regulation Section 1.83-2.

(1)

| Name of taxpayer making election: | |
|---|---|
| Address: | |
| Social Security Number: | |
| Tax Year for which election is being made: | |

(2)     The property with respect to which the election is being made:  262,774 Incentive Units ("Incentive Units") of J.S. Held Management LLC (the "Company").

(3)     Date the property was transferred:  September 29, 2016.

(4)     Forfeiture provision:  The Incentive Units are subject to forfeiture to the Company if the taxpayer ceases to be employed by, or performing services for, the Company or an Affiliate or Subsidiary of the Company during the restriction period.  The restriction period lapses according to the following schedule:

Vesting Commencement Date:  September 29, 2016

262,774 Incentive Units shall vest as follows:  (i) 20% of such Incentive Units shall vest on the first anniversary of the Vesting Commencement Date, (ii) 20% of such Incentive Units shall vest on the second anniversary of the Vesting Commencement Date, (iii) 20% of such Incentive Units shall vest on the third anniversary of the Vesting Commencement Date, (iv) 20% of such Incentive Units shall vest on the fourth anniversary of the Vesting Commencement Date and (v) 20% of such Incentive Units shall vest on the fifth anniversary of the Vesting Commencement Date (in each case rounded down to the next whole Unit).

(5)     The fair market value at the time of the transfer of the Incentive Unit (determined without regard to any restriction other than a restriction that by its terms will never lapse) is $1.37 per Incentive Unit.

(6)     The amount paid for the Incentive Units is $1.37 per Incentive Unit.

(7)     A copy of this statement has been furnished to the Company.

(8)     This statement is executed as of _____, 2016.

_____
Taxpayer

<u>**ANNEX B**</u>

[J.S. HELD MANAGEMENT LLC INCENTIVE PLAN]

# J.S. HELD MANAGEMENT LLC
# EQUITY INCENTIVE PLAN

The J.S. Held Management LLC Equity Incentive Plan (the "Plan") is designed to provide an incentive to certain Employees (as defined in Section 12) of J.S. Held Management LLC, a limited liability company organized under the laws of the State of Delaware (the "Company"), or any of its Affiliates or Subsidiaries (each as defined in Section 12) and Non-Employee Managers and Key Advisors (each as defined in Section 12) who perform services for the Company or its Affiliates or Subsidiaries, and to offer an additional inducement in obtaining the services of such persons. The Plan provides an opportunity to receive incentive grants relating to Incentive Units having the rights and obligations specified with respect to the Company's Class B Common Units and P Series of Class C Common Units, each as defined in, and as permitted under, the Company's Limited Liability Company Agreement, entered into as of March 30, 2015, as may be amended from time to time (the "Operating Agreement"). Capitalized terms used herein and not otherwise defined shall have the meaning assigned to those terms in the Operating Agreement.

1.    Administration.

(a)    Committee. The Plan shall be administered and interpreted by the Managing Member or by a committee appointed by the Managing Member. The committee may delegate authority to one or more subcommittees, as it deems appropriate. To the extent that the Managing Member, the committee or a subcommittee administers the Plan, references in the Plan or an Award Agreement (as defined in Section 1(d)) to the "Committee" shall be deemed to refer to such Managing Member, committee or subcommittee.

(b)    Committee Authority. The Committee shall have the sole authority to: (i) determine the individuals to whom grants shall be made under the Plan; (ii) determine the type, size and terms of the grant to be made to each such individual; (iii) determine the time when the grants will be made and the duration of any applicable Restriction Period (as defined in Section 4(a)), including the acceleration of vesting; (iv) determine any Profits Interest Hurdle or P Series Liquidation Value with respect to the Incentive Units subject to the grant; (v) determine the Fair Market Value of the Incentive Units subject to the grant and any formula for determining the value of the Incentive Units being granted; (vi) determine whether vesting shall accelerate for any reason; (vii) subject to Sections 8(c) and 15(b), amend the terms of any previously issued grant; and (viii) deal with any other matters arising under the Plan.

(c)    Committee Determinations. The Committee shall have full power and authority to administer and interpret the Plan, to make factual determinations and to adopt or amend such rules, regulations, agreements and instruments for implementing the Plan and for the conduct of its business as the Committee deems necessary or advisable, in its sole discretion. The Committee's interpretations of the Plan and all determinations made by the Committee pursuant to the powers vested in it hereunder shall be conclusive and binding on all persons having any interest in the Plan or in any awards granted hereunder. All powers of the Committee shall be executed in its sole discretion, in the best interest of the Company, not as a fiduciary, and in keeping with the objectives of the Plan, and need not be uniform as to similarly situated individuals.

(d)    Grants. Awards under the Plan shall consist of grants of Incentive Units as described in Section 4 ("Unit Awards"). All Unit Awards shall be subject to the terms and conditions set forth herein and in the Operating Agreement and to such other terms and conditions consistent with this Plan and the Operating Agreement as the Committee deems appropriate and as are specified in writing by the Committee to the individual in a grant instrument or an amendment to the grant instrument (the

"Award Agreement"). All Unit Awards shall be made conditional upon the Grantee's (as defined in Section 12) acknowledgement, in writing or by acceptance of the Unit Award, that all decisions and determinations of the Committee shall be final and binding on the Grantee, the Grantee's beneficiaries and any other person having or claiming an interest under such Unit Award. The Committee shall approve the form and provisions of each Award Agreement. Unit Awards granted under the Plan need not be uniform as among the Grantees.

      2.     Incentive Units Subject to the Plan. Subject to adjustment as described in Section 6, the aggregate number of Incentive Units that may be issued or transferred under the Plan is the aggregate number set forth in the Operating Agreement or any exhibit or schedule thereto, as it may be amended from time to time. The Incentive Units may be authorized but unissued Incentive Units or they may be reacquired Incentive Units. If and to the extent any Unit Award is forfeited, the Incentive Units subject to such grant shall again be available for purposes of the Plan.

      3.     Eligibility for Participation.

      (a)     Eligible Persons. All Employees and Non-Employee Managers shall be eligible to participate in the Plan. A Key Advisor shall be eligible to participate in the Plan if the Key Advisor renders bona fide services to the Company or its Affiliates or Subsidiaries, the services are not in connection with the offer and sale of securities in a capital-raising transaction, and the Key Advisors do not directly or indirectly promote or maintain a market for the Company's securities.

      (b)     Selection of Grantees. The Committee shall select, in its sole discretion, consistent with the purposes of the Plan, the Employees, Non-Employee Managers and Key Advisors to receive grants and shall determine the number of Incentive Units subject to a particular grant in such manner as the Committee determines.

      4.     Unit Awards. The Committee may issue or transfer Unit Awards to a Grantee upon such terms as the Committee deems appropriate. Except as otherwise set forth in an applicable Award Agreement, the following provisions are applicable to Unit Awards:

      (a)     General. Incentive Units issued or transferred pursuant to Unit Awards may be subject to restrictions or no restrictions, as determined by the Committee; provided, however, that all Unit Awards of P Series of Class C Common Units shall be structured as profits interests, within the meaning of Internal Revenue Service Revenue Procedure 93-27, 1993-2 C.B. 343, and Revenue Procedure 2001-43, 2001-2 C.B. 191, for tax purposes. Each Unit Award of P Series of Class C Common Units may be issued as part of a series and shall be subject to such provisions related to P Series of Class C Common Units as may be set forth in the Operating Agreement. The Committee may, but shall not be required to, establish conditions under which restrictions on Unit Awards shall lapse over a period of time or according to such other criteria as the Committee deems appropriate including, without limitation, restrictions based upon the achievement of specific performance goals. The period of time during which the Unit Awards will remain subject to restrictions will be designated in the Award Agreement as the "Restriction Period."

      (b)     Number of Unit Awards. The Committee shall determine the number of Incentive Units to be issued or transferred pursuant to a Unit Award and the restrictions applicable to such Incentive Units.

      (c)     Threshold Participation; Series Designation. The Committee shall establish a Profits Interest Hurdle and P Series Liquidation Value with respect to each P Series of Class C Common Units, which amounts may be adjusted by the Committee from time to time in accordance with the

Operating Agreement.  The Committee may designate a series number for each P Series of Class C Common Units having the same Profits Interest Hurdle and P Series Liquidation Value and other common features as determined by the Committee.

(d)      Requirement of Employment or Service.  Except as may otherwise be provided in an individual Award Agreement:

(i)      General.  Except as set forth in the applicable Award Agreement, if the Grantee has a Separation from Service (as defined in Section 12), or if other specified conditions are not met, the vesting of the Unit Award shall immediately cease and (A) the Unit Award shall terminate as to all Restricted Incentive Units, and those Restricted Incentive Units shall no longer be deemed outstanding as of the date of Separation from Service, and (B) if the Grantee has been Terminated with Cause or if the Grantee has at any time breached any covenant in the Operating Agreement or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition or non solicitation covenant or agreement with the Company or any of its Affiliates or Subsidiaries, the Unrestricted Incentive Units shall be forfeited by the Grantee on the Forfeiture Date (as defined below), and those Unrestricted Incentive Units shall no longer be deemed outstanding, except to the extent that the Committee provides for complete or partial exceptions to either or both of the requirements set forth in clauses (A) and (B) above as it deems appropriate in its sole discretion.  For the avoidance of doubt, the Company may repurchase or redeem any Unrestricted Incentive Units as described in the Operating Agreement.

(ii)      Post-Termination Cause Determination.  Except as set forth in the applicable Award Agreement, if after the Grantee's Separation from Service for any reason the Company or any of its Affiliates or Subsidiaries learns of an act or omission of the Grantee that the Committee determines in good faith would have resulted in Grantee's Termination with Cause or if Grantor has at any time breached any covenant in the Operating Agreement or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition or non solicitation covenant or agreement with the Company or any of its Affiliates or Subsidiaries, any Unrestricted Incentive Units held by the Grantee shall be forfeited, and those Unrestricted Incentive Units shall no longer be deemed outstanding.

(e)      Restrictions on Transfer.  A Grantee may not Transfer in any way (whether by operation of law or otherwise) the Unit Award (or Incentive Units granted thereunder), except as permitted by the Committee and as set forth in the Award Agreement, and then only after compliance with the requirements of the Operating Agreement, and the Unit Award (or Incentive Units granted thereunder) shall not be subject to execution, attachment or similar processes.  Any attempted Transfer of the Unit Award (or Incentive Units granted thereunder) in violation of the Plan or the Operating Agreement shall be null and void *ab initio* and of no force or effect.

(f)      Right to Receive Distributions During the Restriction Period.  During the Restriction Period, any distributions on Restricted Incentive Units which are Class B Common Units shall be made without regard to any restrictions, but only if and to the extent that such distributions are made prior to the date any such Restricted Incentive Units are forfeited.  No distributions will be made with respect to P Series of Class C Common Units, whether or not restricted, other than in accordance with the Operating Agreement.

(g)      Lapse of Restrictions.  Except as set forth in an applicable Award Agreement, all restrictions imposed on Unit Awards pursuant to this Section 4 (other than those set forth in Section 4(d)(i)(B) or Section 4(d)(ii)) shall lapse upon the expiration of the applicable Restriction Period and the satisfaction of all conditions imposed by the Committee.  The Committee may determine, as to any or all

Unit Awards, that the restrictions shall lapse without regard to any Restriction Period or without regard to any other conditions.

(h)     Treatment as a Member of the Company.  Each Grantee who is granted a Unit Award of P Series of Class C Common Units that is subject to a substantial risk of forfeiture shall make a timely election under Section 83(b) of the Code with respect to such Unit Award (and, in the case of Class B Common Units, such Grantee may at its option make any such election) and shall be treated as a Member (as defined in the Operating Agreement) of the Company for all federal, state and local tax purposes (subject to any limitations set forth in the Operating Agreement) after such election is timely made and proof thereof is provided to the Company.  Any Grantee of Class B Common Units shall be treated as a Member of the Company (as described above) as of the time of grant of such Units.

(i)     Operating Agreement.  To the extent not expressly addressed in the Plan or an applicable Award Agreement, the Unit Awards and the Incentive Units granted thereunder shall be governed by the terms, conditions and restrictions set forth in the Operating Agreement.

5.     Withholding of Taxes.  All Unit Awards under the Plan shall be subject to applicable federal (including FICA), state and local tax withholding requirements.  The Company or its Affiliate or Subsidiary may require that the Grantee or other person receiving the Unit Awards pay to the Company or its Affiliate or Subsidiary the amount of any federal, state or local taxes that the Company or its Affiliate or Subsidiary is required to withhold with respect to such Unit Awards, or the Company or its Affiliate or Subsidiary may deduct from wages or other compensation paid by the Company or its Affiliate or Subsidiary to the Grantee the amount of any withholding taxes due with respect to such Unit Awards.

6.     Adjustments Upon Changes in Interests.  Notwithstanding any other provision of the Plan:

(a)     In the event of a recapitalization, combination, exchange or other change affecting the outstanding Incentive Units as a class without the Company's receipt of consideration, any spin-off of one or more Affiliates or Subsidiaries that results in a substantial reduction in the value of the outstanding Incentive Units or any Capital Contribution, or any repurchase, redemption or other transaction affecting the Incentive Units as a whole or a series of Unit Awards in a manner that changes the economic results intended by the Plan and any Award Agreement, the Committee shall appropriately adjust the aggregate number and kind of Incentive Units subject to the Plan and/or the aggregate number and kind of Incentive Units subject to each outstanding Unit Award that is affected and/or the Profits Interest Hurdle or P Series Liquidation Value of the affected Incentive Units.  Such adjustments shall be conclusive and binding on all parties and may provide for the elimination of fractional Incentive Units, which might otherwise be subject to a Unit Award.  To the extent the foregoing adjustments are to be made to outstanding Unit Awards, such adjustments shall be effected in a manner which shall preclude the enlargement or dilution of rights and benefits under those Unit Awards (other than any dilution resulting from elimination of fractional Incentive Units).  No adjustment shall be made with respect to outstanding Unit Awards in the case of the payment of any cash distribution by the Company unless otherwise determined by the Committee in its sole discretion.

(b)     In the event of a merger, consolidation, sale or exchange by the Company or any of its Affiliates or Subsidiaries of all or substantially all of its capital interests or assets, in which the Company or its Affiliate or Subsidiary is not the surviving entity, except as set forth below or in the Award Agreement, the Unit Awards granted hereunder as of the date of such event shall continue to be outstanding and the Grantee shall be entitled to receive in exchange therefor equity awards in the surviving entity's common stock, or partnership or member interests, of equivalent value to the Unit Award granted hereunder to the Grantee, and with consistent terms, including, without limitation,

regarding the time of vesting, as determined by the Committee in its discretion.  Notwithstanding the foregoing, the Committee may, in its sole discretion, by written notice provided to Grantee or by inclusion in the applicable Award Agreement, advise the Grantee that, upon consummation of the transaction:  (i) take any action determined to be appropriate with respect to all outstanding Unit Awards not theretofore vested; or (ii) all outstanding Unit Awards theretofore vested shall be cancelled in exchange for a cash payment in an amount equal to the then Fair Market Value of the Incentive Units subject to such vested Unit Awards, with such payment to take place as of the date of the consummation of such transaction or thereafter at a time and in a manner that would comply with Section 409A of the Code if applicable.

7.      Requirements for Issuance or Transfer of Incentive Units.

(a)      Operating Agreement and Other Agreements.  It shall be a condition precedent to the receipt of Incentive Units under the Plan that a Grantee execute the Operating Agreement or a counterpart signature page or joinder (or similar instrument) to the Operating Agreement, as in effect from time to time, or any other agreement that may include, without limitation, restrictions on the Transfer of Incentive Units, drag-along rights and other rights protective of other Members and the Company, with respect to any Incentive Units issued or distributed pursuant to the Plan; provided, however, that, in each case, upon execution of the applicable Award Agreement, Grantee assents to and shall be deemed a party to the Operating Agreement and such other agreements that set forth the terms and conditions of the Grantee's interest in the Incentive Units as if the Grantee had executed the counterpart signature page or joinder (or similar instrument); provided further that, if and to the extent requested by the Committee, Grantee confirms and agrees to execute a counterpart signature page or joinder (or similar instrument) to the Operating Agreement and such other agreements.

(b)      Limitations on Issuance or Transfer of Incentive Units.  No Incentive Units shall be issued or transferred in connection with any grant hereunder unless and until all legal requirements applicable to the issuance or transfer of such Incentive Units have been complied with to the satisfaction of the Committee, including all requirements of the Operating Agreement.  The Committee shall have the right to condition any grant made to any Grantee hereunder on such Grantee's undertaking in writing to comply with such restrictions on his or her subsequent disposition of such Incentive Units as the Committee shall deem necessary or advisable.

(c)      Lock-Up Period.  If so requested by the Company or any representative of the underwriters (the "Managing Underwriter") in connection with any underwritten offering of securities of the Company under the Securities Act of 1933, as amended (the "Securities Act"), a Grantee (including any successor or assigns) shall not sell or otherwise transfer any securities of the Company during the 30-day period preceding and the 180-day period following the effective date of a registration statement of the Company filed under the Securities Act for such underwriting (or such shorter period as may be requested by the Managing Underwriter and agreed to by the Company) (the "Market Standoff Period").  The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

8.      Amendment and Termination of the Plan.

(a)      Amendment.  The Plan may be amended or terminated in whole or in part at any time with the written approval of the Managing Member.

(b)      Termination of Plan.  The Plan shall terminate on the date determined by the Managing Member.

(c)     <u>Termination and Amendment of Outstanding Grants</u>.  A termination or amendment of the Plan that occurs after a grant is made shall not materially impair the rights of a Grantee unless the Grantee consents or unless the Committee acts under <u>Section 15(b)</u>.  The termination of the Plan shall not impair the power and authority of the Committee under the Plan with respect to an outstanding grant.  Whether or not the Plan has terminated, an outstanding grant may be terminated or amended under <u>Section 15(b)</u> or may be amended by agreement of the Company and the Grantee consistent with the Plan.

(d)     <u>Governing Document</u>.  The Plan, the Operating Agreement and any Award Agreement executed in connection with a grant hereunder shall be the controlling documents.  No other statements, representations, explanatory materials or examples, oral or written, may amend the Plan, the Operating Agreement or the Award Agreement (if such instrument is entered into) in any manner.  The Plan shall be binding upon and enforceable against the Company and its successors and assigns.

9.     <u>Funding of the Plan</u>.  This Plan shall be unfunded.  The Company shall not be required to establish any special or separate fund or to make any other segregation of assets to assure the payment of any grants under this Plan.  In no event shall interest be paid or accrued on any grant, including unpaid installments of grants.

10.     <u>Rights of Participants</u>.  Nothing in this Plan shall entitle any Employee, Non-Employee Manager, Key Advisor or any other person to any claim or right to be granted a grant under this Plan. Neither this Plan nor any action taken hereunder shall be construed as giving any individual any rights to be retained by or in the employ of the Company or any of its Affiliates or Subsidiaries or any other employment rights.

11.     <u>Fractional Incentive Units</u>.  Except as otherwise determined by the Committee, in its sole discretion, no fractional Incentive Units shall be issued or delivered pursuant to the Plan or any Unit Award.  The Committee shall determine whether cash or other property shall be issued or paid in lieu of such fractional Incentive Units or whether such fractional Incentive Units or any rights thereto shall be forfeited or otherwise eliminated.

12.     <u>Definitions</u>.  For purposes of the Plan, the following terms shall be defined as set forth below:

(a)     "<u>Affiliate</u>" shall mean (i) any person or entity controlling, controlled by or under common control with the Company, including such person's or entity's direct or indirect parents or subsidiaries, whether or not in existence on the date hereof.

(b)     "<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

(c)     "<u>Employee</u>" shall mean an employee of the Company or any of its Affiliates or Subsidiaries, including an employee who is an officer, manager or director.

(d)     "<u>Grantee</u>" shall mean an Employee, Non-Employee Manager or Key Advisor who receives a grant under this Plan.

(e)     "<u>Key Advisors</u>" shall mean a consultant or advisor, including without limitation any board member, who performs services for the Company or any of its Affiliates or Subsidiaries.

(f)     "<u>Non-Employee Manager</u>" shall mean a manager or director of the Company or any of its Affiliates or Subsidiaries who is not an Employee.

(g)      "Separation from Service" shall mean the termination of the Grantee's employment or service provider relationship with the Company and its Affiliates and Subsidiaries as an Employee, Non-Employee Manager or Key Advisor, such that the Grantee shall not be considered to have a Separation from Service until the Grantee ceases to be an Employee, Non-Employee Manager and Key Advisor, unless the Committee determines otherwise.

(h)      "Subsidiary" shall have the same definition as "subsidiary corporation" in Section 424(f) of the Code.

(i)      "Termination with Cause" shall mean a Separation from Service for Cause. Notwithstanding the foregoing, if the Grantee and the Company or any of its Affiliates or Subsidiaries have entered into an employment or services agreement which defines the term "Cause" (or a similar term), such definition shall govern for purposes of determining whether a Termination with Cause has occurred for purposes of the Plan.  The determination of Cause shall be made by the Committee, in its sole discretion.

13.     Headings.  Section headings are for reference only.  In the event of a conflict between a title and the content of a Section, the content of the Section shall control.

14.     Effective Date of the Plan.  The Plan shall be effective as of March __, 2015.

15.     Miscellaneous.

(a)      Grants in Connection with Company Transactions and Otherwise.  Nothing contained in this Plan shall be construed to:  (i) limit the right of the Committee to make grants under this Plan in connection with the acquisition, by purchase, lease, merger, consolidation or otherwise, of the business or assets of any company, firm or association, including grants to employees thereof who become employees of the Company or its Affiliates or Subsidiaries, or for other proper company purposes; or (ii) limit the right of the Company to make other awards outside of this Plan.  Without limiting the foregoing, the Committee may make a grant to an employee of another company who becomes an employee of the Company or its Affiliate or Subsidiary by reason of a merger, consolidation, acquisition of securities or property, reorganization or liquidation involving the Company or any of its Affiliates or Subsidiaries in substitution for a grant made by such company.  The terms and conditions of the substitute grants may vary from the terms and conditions required by the Plan and from those of the substituted incentives.  The Committee shall prescribe the provisions of the substitute grants.

(b)      Compliance with Law.  The Plan and the obligations of the Company to issue or transfer Incentive Units shall be subject to all applicable laws and to approvals by any governmental or regulatory agency as may be required.  It is the intent of the Company that, to the extent applicable, grants made under the Plan and any payments made in respect of such grants comply with the requirements of Section 409A of the Code and the regulations thereunder or be subject to an exception thereunder.  To the extent that any legal requirement as set forth in the Plan ceases to be required under applicable law, the Committee may determine that such Plan provision shall cease to apply.  The Committee may revoke any grant if such revocation is necessary to comply with applicable law or regulation or modify a grant or the Plan without the consent of the affected Grantees to bring a grant or the Plan into compliance with any applicable law or regulation; provided that any such modification shall preserve, to the extent reasonably possible, the economic value of any affected outstanding grant.  The Committee may, in its sole discretion, agree to limit its authority under this Section.

(c)      Legends; Payment of Expenses.  The Company may endorse such legend or legends upon the certificates, if any, evidencing Incentive Units issued in connection with a Unit Award

and may issue such "stop transfer" instructions to its transfer agent in respect of such Incentive Units as it determines, in its discretion, to be necessary or appropriate to:  (i) prevent violation of, or to qualify for an exemption from, the registration requirements of the Securities Act and any applicable state securities laws; (ii) implement the provisions of the Plan or any agreement between the Company and Grantee with respect to such Incentive Units; or (iii) restrict a Member's right to sell Incentive Units acquired pursuant to a Unit Award.

The Company shall pay all issuance taxes with respect to the issuance of Incentive Units acquired pursuant to a Unit Award, as well as all fees and expenses incurred by the Company in connection with such issuance.

(d)    Partial Invalidity.  The invalidity, illegality or unenforceability of any provision in the Plan or Award Agreement shall not affect the validity, legality or enforceability of any other provision, all of which shall be valid, legal and enforceable to the fullest extent permitted by applicable law.

16.    Governing Law; Construction.  The validity, construction, interpretation and effect of the Plan and Award Agreements issued under the Plan shall be governed and construed by, and determined in accordance with, the laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof.  Neither the Plan nor any Award Agreement shall be construed or interpreted with any presumption against the Company by reason of the Company causing the Plan or Award Agreement to be drafted.  The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Plan and shall not be employed in the construction of the Plan.  Whenever from the context it appears appropriate, any term stated in either the singular or plural shall include the singular or plural, and any term stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter.

**ANNEX C**

COVENANTS AGREEMENT OF GRANTEE

1.     Grantee and Dodd acknowledge that during the term of Dodd's service as an employee, director, consultant or advisor of the Company and/or any of its Subsidiaries or Affiliates, Dodd will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, its Subsidiaries and their Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Annex, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information"). In addition, Grantee and Dodd acknowledge that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which Grantee or Dodd is subject, Grantee and Dodd shall not, directly or indirectly, disclose or use (other than solely for the purposes of Grantee monitoring and analyzing their investment in the Company or of Dodd performing her duties as a manager, officer, employee, consultant or other service provider of the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during her association or employment with the Company or thereafter, any Confidential Information of which Grantee or Dodd is or becomes aware. Grantee or Dodd in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.  Nothing contained in this Paragraph 1 shall prevent Grantee or Dodd from disclosing Confidential Information: (a) upon the order of any court or administrative agency; (b) upon the request or demand of any regulatory agency or authority having jurisdiction over Grantee or Dodd; (c) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; and (d) to the extent necessary in connection with the exercise of any remedy hereunder; provided, that in the case of clause (a), (b) or (c), Grantee and Dodd shall notify the Company of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

2.     In light of Grantee's and Dodd's access to Confidential Information and position of trust and confidence with the Company and/or its Subsidiaries or Affiliates, Grantee and Dodd hereby agree that, for a period of two (2) years following the termination of Grantee's employment with the Company or any of its Subsidiaries or Affiliates (the "Restricted Period"), each of Grantee and Dodd shall not, and shall cause their Affiliates not to, directly or indirectly, (x) engage in or assist others in engaging in any Restricted Business (defined below) or any division or business segment of any person engaged in any Restricted Business, (y) have an interest in any Restricted Business or any division or business segment of any person engaged in any Restricted Business in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant, or (z) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Annex) between the Company or any of its Subsidiaries or Affiliates and customers or suppliers of the Company or any of its Subsidiaries or Affiliates, or cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Company or any of its Subsidiaries or Affiliates (including any

existing or former client or customer of the Company or any of its Subsidiaries or Affiliates and any person that becomes a client or customer of the Company or any of its Subsidiaries or Affiliates during the Restricted Period), or any other person who has a material business relationship with the Company or any of its Subsidiaries or Affiliates, to terminate or modify any such actual or prospective relationship. "Restricted Business" means the business as conducted by the Company from time to time including providing the services of damage consulting and estimating, construction consulting and estimating, insurance claims consulting, property replacement cost appraisals, expert testimony and litigation support, dispute resolution, project monitoring and clerking, water and smoke restoration consulting, surety services, construction engineering, construction project scheduling, construction project management, cost and bid package analysis, construction budgeting, builder's risk consulting, construction defect consulting, construction restoration and analysis, risk management, health and safety compliance and consulting, disaster recovery and environmental assessments. It is recognized that following the date hereof, the Restricted Business is expected to be conducted throughout the world (including the following parishes in the State of Louisiana: Acadia, Allen Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, Lafayette, Lafourche, La Salle, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Point Coupee, Rapides, Red River, Richland, Sabine, Saint Bernard, Saint Charles, Saint Helena, Saint James, Saint John the Baptist, Saint Landry, Saint Martin, Saint Mary, Saint Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermillion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana and Winn) (the "Territory") and that more narrow geographical limitations of any nature on this noncompetition covenant (or the non-solicitation covenant set forth in this Annex) are therefore not appropriate.

3.     In light of Grantee's and Dodd's access to Confidential Information and position of trust and confidence with the Company, Grantee and Dodd further agree that, during the Restricted Period, each of Grantee and Dodd shall not, and shall cause their Affiliates not to, directly or indirectly, (a) hire or solicit, or attempt to hire or solicit, any employee of the Company or any of its Subsidiaries or Affiliates, or person who was employed by the Company or any of its Subsidiaries or Affiliates at any time during such period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees or (b) solicit or entice, or attempt to solicit or entice, any clients or customers of the Company or any of its Subsidiaries or Affiliates or potential clients or customers of the Company or any of its Subsidiaries or Affiliates.

4. From and after the date hereof, each of Grantee and Dodd shall not, and shall cause their Affiliates not to, directly or indirectly, disparage, defame or discredit the Company or any of its Subsidiaries or Affiliates or any of their respective officers, directors, employees, or advisors (collectively, the "Group") or its or their businesses or reputations, or engage in any activity that would have the effect of disparaging, defaming or discrediting the Group, nor shall Grantee or Dodd interfere with or disrupt the business activities of the Group, or engage in any activity that would have the effect of interfering with or disrupting the business activities of the Group.

5.     In the event that any covenant contained in this Annex should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable law. Each covenant contained in this Annex and each provision thereof is a severable and distinct covenant and provision.

6.     Grantee and Dodd agree to promptly disclose to the Company or its Subsidiaries or Affiliates, as the case may be, any and all work product, inventions, artistic works, works of authorship, designs, methods, processes, technology, patterns, techniques, data, Confidential Information, patents, trade secrets, trademarks, domain names, copyrights, and the like, and all other intellectual property relating to the business of the Company, its Subsidiaries and any of its Affiliates which are created, authored, composed, invented, discovered, performed, perfected, learned or reduced to practice by Grantee or Dodd (either solely or jointly with others) during the period of Dodd's employment or service with the Company or its Subsidiaries or Affiliates (collectively, together with such intellectual property as may be owned or acquired by the Company, the "Company Intellectual Property"). The Company Intellectual Property is and shall be the sole and absolute property of the Company, its Subsidiaries and its Affiliates. All work performed by Dodd in authoring, composing, inventing, creating, developing or modifying Company Intellectual Property and/or other work product to which copyright protection may attach during the course of Dodd's employment with the Company or its Subsidiaries or Affiliates shall be considered "works made for hire" to the extent permitted under applicable copyright law and will be considered the sole property of the Company.  To the extent such works, work product or Company Intellectual Property are not considered "works made for hire," all right, title, and interest to such works, work product and Company Intellectual Property, including, but not limited to, all copyrights, patents, trademarks, rights of publicity, and trade secrets, are hereby assigned to the Company by Dodd and Dodd agrees, at the Company's expense, to execute any documents requested by the Company, its Subsidiaries or any of its Affiliates at any time in relation to such assignment.  Grantee and Dodd acknowledge and agree that the Company is and will be the sole and absolute owner of all trademarks, service marks, domain names, patents, copyrights, trade dress, trade secrets, business names, rights of publicity, inventions, proprietary know-how and information of any type, whether or not in writing, and all other intellectual property used by the Company or held for use in the business of the Company, including all Company Intellectual Property.  Grantee and Dodd further acknowledge and agree that any and all derivative works, developments, or improvements based on intellectual property, materials and assets subject to this Paragraph 6 created during Dodd's period of service to or employment with the Company and its Subsidiaries and Affiliates (including, without limitation, Company Intellectual Property) shall be exclusively owned by the Company.  Grantee and Dodd agree to cooperate with the Company, its Subsidiaries and any of its Affiliates, at no additional cost to such parties (whether during or after the period of Dodd's employment with the Company), in the confirmation, registration, protection and enforcement of the rights and property of the Company, its Subsidiaries and its Affiliates in such intellectual property, materials and assets, including, without limitation, the Company Intellectual Property.  In accordance with certain state laws, Grantee and Dodd are advised that the foregoing regarding ownership of work product does not apply to any invention for which no equipment, supplies, facilities or trade secret information of the Company, its Subsidiaries or its Affiliates was used and that was developed entirely on Dodd's own time, unless (a) the invention relates to the business or actual or demonstrably anticipated research or development of the Company, its Subsidiaries or any of its Affiliates, or (b) the invention results from any work performed by Dodd for the Company, its Subsidiaries or any of its Affiliates.

7.     Grantee and Dodd acknowledge and agree that all files, records, documents, computer-recorded information, drawings, specifications, equipment and similar items relating to the business of the Group, whether prepared by Dodd or otherwise coming into Dodd's possession, shall remain the exclusive property of the Group and shall not be removed from the premises of any member of the Group under any circumstances whatsoever without the prior written consent of the Board, except when (and only for the period) necessary to carry out Dodd's duties as an employee, director, consultant or advisor, and if removed shall be immediately returned to the applicable member of the Group upon any termination of Dodd's period of employment or service and no copies thereof shall be kept by Grantee or Dodd.  The foregoing shall not limit Grantee's entitlement to retain documents reasonably related to Grantee's interest as an equityholder in the Company.

8.     Grantee and Dodd understand that the Group does not wish to incorporate any unlicensed or unauthorized material into its products or services.  Therefore, Grantee and Dodd agree that Grantee and Dodd will not disclose to the Group, use in the Group's business or cause the Group to use any information or material that is a trade secret, or confidential or proprietary information, of any third party, including, but not limited to, any former employer, competitor or client, unless the Group has the right to receive and use such information or material.  Dodd will not incorporate into Dodd's work any information or material which is subject to the copyrights of any third party unless the Group has a written agreement with such third party or otherwise has the right to receive and use such information or material.

9.     Grantee and Dodd acknowledge that the agreements contained in this Annex are reasonable and necessary for the protection of the Group and are an essential inducement to the Company's grant of Incentive Units.  Grantee and Dodd acknowledge, along with the Company, that the time, scope, geographic area and other provisions of this Annex have been specifically negotiated by sophisticated commercial parties and agree that all such provisions are reasonable under the circumstances. Accordingly, Grantee and Dodd shall be bound by the provisions of this Annex to the maximum extent permitted by law, it being the intent and spirit of the parties that the covenants contained in this Annex shall be fully enforceable.  In the event that any provisions of this Annex (or any portion thereof) shall be determined by an arbitrator or any court of competent jurisdiction to be unenforceable by reason of their extending for too great a period of time or over too great a geographic area or by reason of their being too extensive in any other respect, they shall be interpreted to extend only over the maximum period of time for which they may be enforceable and/or over the geographic area as to which they may be enforceable and/or to the maximum extent in all other respects as to which they may be enforceable, all as determined by an arbitrator or, pursuant to Paragraph 11, a court in an action for equitable enforcement.

10.     Grantee and Dodd acknowledge that a breach of any of the covenants contained in this Annex may cause irreparable damage to the Group, the exact amount of which would be difficult to ascertain, and that the remedies at law for any such breach or threatened breach would be inadequate.  Accordingly, Grantee and Dodd agree that if Grantee or Dodd breaches or threatens to breach any of the covenants contained in this Annex, in addition to any other remedy which may be available to the Company at law or in equity, the Company shall be entitled to (i) cease or withhold any payments and/or benefits due and payable to Grantee or Dodd pursuant to the Incentive Unit Grant Agreement or any other agreement between Grantee or Dodd, on one hand, and the Company or its Affiliates or Subsidiaries, on the other hand, in excess of any such amounts payable in consideration for Grantee's or Dodd's release of claims against the Company; provided, however, that, for the avoidance of doubt, the Company's taking such action shall not eliminate any liability for wrongfully ceasing or withholding such payment or benefits; and/or (ii) institute and prosecute proceedings in any court of competent jurisdiction for specific performance and injunctive relief to prevent the breach or any threatened breach thereof without bond or other security or a showing that monetary damages will not provide an adequate remedy.  Grantee and Dodd agree to disclose in advance the existence and terms of the restrictions and covenants contained in this Annex to any employer or service recipient by whom Grantee or Dodd might be employed or retained during the period in which the covenants or restrictions apply.

11.     Grantee and Dodd acknowledge that the services to be rendered by Dodd to the Company or its Affiliates or Subsidiaries are of a unique nature and that it would be difficult or impossible to replace such services and that by reason thereof Grantee and Dodd agree and consent that if Grantee or Dodd violates the provisions of this Annex, the Company, in addition to any other rights and remedies available under this Contract or otherwise, shall be entitled to an injunction to be issued or specific performance to be required restricting Grantee or Dodd from committing or continuing any such violation.  Moreover, Grantee and Dodd acknowledge that the provisions in this Annex shall be

construed as agreements independent of any other provision in any other agreement by, between and among Grantee and Dodd, on one hand, and any member of the Group, on the other hand, and independent of the existence of any claim or cause of action of Grantee or Dodd against any member of the Group, whether arising out of the Agreement, Dodd's employment or service with any member of the Group, or otherwise, which claim or cause of action shall not constitute a defense to the enforcement of the provisions in this Annex.

12.   Subject to Paragraph 5, if one or more of the provisions (or any portion thereof) in this Annex are held to be invalid, illegal or incapable of being enforced by any rule of law or public policy in any jurisdiction, any such invalidity, illegality or unenforceability shall not affect any other provision of this Annex or any other jurisdiction, and all other terms and provisions (or other portions thereof) of this Annex shall nevertheless remain in full force and effect.  Upon such determination that any provision (or portion thereof) of this Annex is invalid, illegal or incapable of being enforced, this Annex shall be deemed modified so as to effect the original intent of the parties as closely as possible to the greatest extent possible.

13.   The terms of this Annex and the relationship of the parties in connection with the subject matter of this Annex shall be construed and enforced according to the laws of the State of Delaware without giving effect to any choice of law or conflicts of law provisions or rules (whether of the State of Delaware or any other jurisdiction) that would cause the application of the law of any jurisdiction other than that of the State of Delaware.  This Annex shall be binding upon and inure to the benefit of Grantee, Dodd and the Company and its successors and assigns and shall survive any sale of the Company or termination of employment or service.

14.   Grantee and Dodd agree that, in the event of a final determination of Grantee's or Dodd's breach of any of the covenants contained in this Annex, the restrictions in the relevant paragraph shall be extended for a period equal to the period that Grantee or Dodd was in breach.

15.   Grantee and Dodd represent and acknowledge that (i) Grantee and Dodd have each been advised by the Company to consult their own legal counsel with respect to this Annex and (ii) Grantee and Dodd have each had full opportunity, prior to execution of this Annex, to review thoroughly this Annex with their legal counsel.

**<u>ANNEX D</u>**

[J.S. HELD MANAGEMENT LLC OPERATING AGREEMENT]

**LIMITED LIABILITY COMPANY AGREEMENT**

among

**J.S. HELD MANAGEMENT LLC**

and

**THE MEMBERS NAMED HEREIN**

dated as of

March 30, 2015

# TABLE OF CONTENTS

**ARTICLE I** DEFINITIONS .............................................................................................1

Section 1.01 Definitions. ......................................................................................................1

Section 1.02 Interpretation. .................................................................................................13

**ARTICLE II** ORGANIZATION ....................................................................................13

Section 2.01 Formation. ......................................................................................................13

Section 2.02 Name. .............................................................................................................13

Section 2.03 Principal Office. .............................................................................................13

Section 2.04 Registered Office; Registered Agent. ...........................................................13

Section 2.05 Purpose; Powers. ...........................................................................................14

Section 2.06 Term. ..............................................................................................................14

Section 2.07 No State-Law Partnership. .............................................................................14

**ARTICLE III** UNITS .....................................................................................................14

Section 3.01 Units Generally. .............................................................................................14

Section 3.02 Authorization and Issuance of Class A Common Units. ................................15

Section 3.03 Authorization and Issuance of Class B Common Units. ................................15

Section 3.04 Authorization and Issuance of Class C Common Units. ................................15

Section 3.05 Incentive Units. ..............................................................................................15

Section 3.06 No Pre-Emptive Rights for Incentive Units. ..................................................18

Section 3.07 Other Issuances. .............................................................................................18

Section 3.08 Certification of Units. .....................................................................................18

**ARTICLE IV** MEMBERS ..............................................................................................19

Section 4.01 Admission of New Members. .........................................................................19

Section 4.02 Representations and Warranties of Members. ................................................19

Section 4.03 No Personal Liability. ....................................................................................20

Section 4.04 No Withdrawal. ..............................................................................................21

Section 4.05 Death. .............................................................................................................21

Section 4.06 Voting. ............................................................................................................21

Section 4.07 Meetings. ........................................................................................................21

Section 4.08 Quorum. ..............................................................................................22

Section 4.09 Action Without Meeting. ....................................................................22

Section 4.10 Power of Members. .............................................................................22

Section 4.11 No Interest in Company Property. .......................................................22

**ARTICLE V** CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS .......................23

Section 5.01 Initial Capital Contributions. .............................................................23

Section 5.02 Additional Capital Contributions. ......................................................23

Section 5.03 Maintenance of Capital Accounts. ......................................................23

Section 5.04 Succession Upon Transfer. .................................................................24

Section 5.05 Negative Capital Accounts. ................................................................24

Section 5.06 No Withdrawal. ...................................................................................24

Section 5.07 Treatment of Loans From Members. ..................................................24

Section 5.08 Modifications. .....................................................................................24

**ARTICLE VI** ALLOCATIONS ....................................................................................24

Section 6.01 Allocation of Net Income and Net Loss. ...........................................24

Section 6.02 Regulatory and Special Allocations. ..................................................25

Section 6.03 Tax Allocations. ..................................................................................26

Section 6.04 Allocations in Respect of Transferred Units. .....................................27

Section 6.05 Curative Allocations. ..........................................................................27

**ARTICLE VII** DISTRIBUTIONS ................................................................................27

Section 7.01 General. ...............................................................................................27

Section 7.02 Priority of Distributions. .....................................................................27

Section 7.03 Limitations on Class C Common Units. .............................................28

Section 7.04 Tax Advances. .....................................................................................28

Section 7.05 Tax Withholding; Withholding Advances. .........................................29

Section 7.06 Distributions in Kind. .........................................................................30

**ARTICLE VIII** MANAGEMENT .................................................................................31

Section 8.01 Establishment of the Board. ...............................................................31

Section 8.09 Officers. ...............................................................................................31

Section 8.10 No Personal Liability. .........................................................................31

**ARTICLE IX** PRE-EMPTIVE RIGHTS ........................................................................31

Section 9.01 Pre-emptive Right. ...............................................................................................31

**ARTICLE X** TRANSFER ...........................................................................................34

Section 10.01 General Restrictions on Transfer. .....................................................................34

Section 10.02 Permitted Transfers. ..........................................................................................34

Section 10.03 Drag-along Rights. .............................................................................................34

Section 10.04 Incentive Units Purchase Right. ........................................................................35

**ARTICLE XI** COVENANTS .......................................................................................37

Section 11.01 Confidentiality. ..................................................................................................37

Section 11.02 Other Business Activities. ..................................................................................38

Section 11.03 Non-compete; Non-solicit. .................................................................................39

**ARTICLE XII** ACCOUNTING; TAX MATTERS ......................................................40

Section 12.02 Tax Matters Member. .........................................................................................40

Section 12.03 Tax Returns. .......................................................................................................41

Section 12.04 Company Funds. .................................................................................................41

**ARTICLE XIII** DISSOLUTION AND LIQUIDATION ...............................................41

Section 13.01 Events of Dissolution. ........................................................................................41

Section 13.02 Effectiveness of Dissolution. .............................................................................42

Section 13.03 Liquidation. ........................................................................................................42

Section 13.04 Cancellation of Certificate. ...............................................................................43

Section 13.05 Survival of Rights, Duties and Obligations. ......................................................43

Section 13.06 Recourse for Claims. ..........................................................................................43

**ARTICLE XIV** EXCULPATION AND INDEMNIFICATION ....................................43

Section 14.01 Exculpation of Covered Persons. .......................................................................43

Section 14.02 Liabilities and Duties of Covered Persons. ........................................................44

Section 14.03 Indemnification. .................................................................................................44

Section 14.04 Survival. .............................................................................................................47

**ARTICLE XV** MISCELLANEOUS ...........................................................................47

Section 15.01 Expenses. ............................................................................................................47

iii

Section 15.02 Further Assurances. ...................................................................................................47

Section 15.03 Notices. .........................................................................................................................47

Section 15.04 Headings. ......................................................................................................................48

Section 15.05 Severability. ..................................................................................................................48

Section 15.06 Entire Agreement. .........................................................................................................48

Section 15.07 Successors and Assigns. ...............................................................................................48

Section 15.08 No Third-party Beneficiaries. ......................................................................................49

Section 15.09 Amendment. ..................................................................................................................49

Section 15.10 Waiver. .........................................................................................................................49

Section 15.11 Governing Law. ............................................................................................................50

Section 15.12 Submission to Jurisdiction. ..........................................................................................50

Section 15.13 Waiver of Jury Trial. ....................................................................................................50

Section 15.14 Equitable Remedies. .....................................................................................................50

Section 15.15 Remedies Cumulative. ..................................................................................................51

Section 15.16 Counterparts. ................................................................................................................51

Section 15.17 Initial Public Offering. .................................................................................................51

DB1/ 82337237.6

## LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement of J.S. Held Management LLC, a Delaware limited liability company (the "**Company**"), is entered into as of March 30, 2015 by and among the Company, the Initial Members executing this Agreement as of the date hereof and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a Joinder Agreement.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in **Section** 1.01 of this Agreement.

### RECITALS

WHEREAS, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on February 25, 2015 (the "**Certificate of Formation**"); and

WHEREAS, in connection with the issuance, as of the date hereof, of certain interests in the Company to the Initial Members, as set forth on the Members Schedule, the Members desire to enter into this Agreement on the terms and conditions as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
#### DEFINITIONS

**Section 1.01   Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this **Section** 1.01:

"**Acceptance Notice**" has the meaning set forth in **Section 9.01(d)**.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)       crediting to such Capital Account any amount which such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)       debiting to such Capital Account the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*).

"**Adjusted Taxable Income**" of a Member for a Fiscal Year (or portion thereof) with respect to Units held by such Member means the federal taxable income allocated by the Company to the Member with respect to such Units (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); *provided*, that such taxable income shall be computed (i) minus any excess taxable loss or excess taxable credits of the Company for any prior period allocable to such Member with respect to

such Units that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect members of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or indirect members of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) without taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754 or the application of Code Section 704(c).

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"**Agreement**" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Award Agreements**" has the meaning set forth in **Section 3.05(c)**.

"**Bankruptcy**" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided*, that if the adjusted basis for federal income tax purposes of an asset

2

at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Managing Member in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*g*)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c)     the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Managing Member, as of the following times:

(i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii)     the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company;

(iii)     the grant to a Service Provider of any Class B Common Units or Class C Common Units; and

(iv)     the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(*g*);

*provided*, that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Managing Member reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)     the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*); *provided*, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

3

(e)  if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of Wilmington, Delaware are authorized or required to close.

"**Capital Account**" has the meaning set forth in **Section** 5.03.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member; *provided*, *however*, that for purposes of **Section 7.02(a)**, no Member shall be deemed to have made any Capital Contribution to the Company with respect to the issuance to such Member of a Class B Common Unit, the vesting of a Class B Common Unit or a Code Section 83(b) election made by such Member with respect to a Class B Common Unit.

"**Cause,**" with respect to any particular Service Provider, has the meaning set forth in any effective Award Agreement, employment agreement or other written contract of engagement entered into between the Company or member of the Management Company Group and such Service Provider, and for the avoidance of doubt the definition of "Cause" set forth in any such Award Agreement, employment agreement or other written contract of engagement shall control in all respects; provided, however, if none, then "**Cause**" means any of the following:

(a)  the Managing Member's good faith determination of such Service Provider's material failure to perform his or her duties as an employee or other associate of the Company or any of the members of the Management Company Group, which failure has continued unremedied for more than thirty (30) days after the Company has provided written notice thereof provided that such notice shall set forth in reasonable detail the nature of such material non-performance;

(b)  such Service Provider's fraud, embezzlement or other material dishonesty or breach of fiduciary duty against the Company or any of the members of the Management Company Group as determined by the Managing Member;

(c)  any conviction of, or the entering of a plea of guilty or *nolo contendere* to, a crime or the commission of an act that involves moral turpitude, as determined by the Board, or any willful or material violation by such Service Provider of any federal, state or foreign securities laws;

(d)  the use (including being under the influence) or possession of illegal drugs by such Service Provider on the premises of the Company or any of the members of the Management Company Group or while performing any duties or responsibilities with the Company or any of the members of the Management Company Group;

(e)  the Managing Member's good faith determination of a material violation by such Service Provider of any written rule or policy of the Company or any of the members of the Management Company Group, which violation, to the extent capable of cure, has continued

4

unremedied for more than thirty (30) days after the Company has provided written notice thereof, provided that such notice shall set forth in reasonable detail the nature of such material violation; or

(f)   the breach by such Service Provider of any covenant undertaken in **Article** XI herein, any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the members of the Management Company Group.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Change of Control**" means: (a) the sale of all or substantially all of the consolidated assets of J.S Held Holdings, the Company or the Company Subsidiaries to a Third Party Purchaser; (b) a sale resulting in no less than a majority of the Common Units on a Fully Diluted Basis being held by a Third Party Purchaser; or (c) a merger, consolidation, recapitalization or reorganization of the Company or J.S. Held Holdings with or into a Third Party Purchaser that results in the Managing Member owning less than a majority of the voting power of the Membership Interests of the Company, or Sponsor (as defined in the operating agreement of J.S. Held Holdings) owning less than a majority of the voting power of the Membership Interests of J.S. Held Holdings, as applicable, or the Managing Member or Sponsor, as applicable, being unable to designate or elect a majority of the Managers (or the board of directors (or its equivalent)) of the resulting entity or its parent company.

"**Class A Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common A Common Units" in this Agreement.

"**Class B Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common B Common Units" in this Agreement.

"**Class C Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common C Common Units" in this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Common Pro Rata Portion**" means, for purposes of **Section** 9.01, with respect to any Pre-emptive Member holding Common Units, on any issuance date for New Securities, a fraction determined by dividing (i) the number of Class A Common Units and Class B Common Units on a Fully Diluted Basis owned by such Pre-emptive Member immediately prior to such issuance by (ii) the total number of Class A Common Units and Class B Common Units on a Fully Diluted Basis held by the Members on such date immediately prior to such issuance.

"**Common Units**" means Class A Common Units, Class B Common Units and Class C Common Units.

"**Company**" has the meaning set forth in the Preamble.

5

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Section 1.704-2(b)(2) of the Treasury Regulations, substituting the term "Company" for the term "partnership" as the context requires.

"**Company Opportunity**" has the meaning set forth in **Section 11.02**.

"**Company Subsidiary**" means a Subsidiary of the Company.

"**Competitor**" has the meaning set forth in **Section 11.03(a)**.

"**Confidential Information**" has the meaning set forth in **Section 11.01(a)**.

"**Covered Person**" has the meaning set forth in **Section 14.01(a)**.

"**Delaware Act**" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§ 18-101, *et seq*, and any successor statute, as it may be amended from time to time.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided*, that none of the following shall be a Distribution: (a) any redemption or purchase by the Company or any Member of any Units or Unit Equivalents; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a Service Provider or Manager for the Company or a Company Subsidiary. "**Distribute**" when used as a verb and "**Distributable**" when used as an adjective shall each have a correlative meaning.

"**Drag-along Member**" has the meaning set forth in **Section 10.03(a)**.

"**Drag-along Notice**" has the meaning set forth in **Section 10.03(b)**.

"**Drag-along Sale**" has the meaning set forth in **Section 10.03(a)**.

"**Dragging Member**" has the meaning set forth in **Section 10.03(a)**.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Estimated Tax Amount**" of a Member for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Managing Member. In making such estimate, the Managing Member shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as in the reasonable business judgment of the Managing Member are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

6

"**Excess Amount**" has the meaning set forth in **Section 7.04(c)**.

"**Exercise Period**" has the meaning set forth in **Section 9.01(d)**.

"**Exercising Member**" has the meaning set forth in **Section 9.01(e)**.

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Managing Member based on such factors as the Managing Member, in the exercise of its reasonable business judgment, considers relevant, but, with respect to any Class A Common Units or Class B Common Units, without regard to minority discount, lack of liquidity or lack of voting rights.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**Forfeiture Allocations**" has the meaning set forth in **Section 6.02(e)**.

"**Fully Diluted Basis**" means, as of any date of determination, (a) with respect to all the Units, all issued and outstanding Units of the Company and all Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable, or (b) with respect to any specified type, class or series of Units, all issued and outstanding Units designated as such type, class or series and all such designated Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**J.S Held Holdings**" has the meaning set forth in **Section 3.05(a)**.

"**Incentive Plan**" has the meaning set forth in **Section 3.05(c)**.

"**Incentive Units**" means the Class B Common Units and P Series of Class C Common Units issued pursuant to **Section 3.05(a)** and **Section 3.05(b)**, which Units shall have the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Incentive Units" in this Agreement and includes both Restricted Incentive Units and Unrestricted Incentive Units.

"**Initial Management Member**" means each Person identified as a Management Member as of the date hereof.

"**Initial Member**" has the meaning set forth in the term Member.

"**Initial Public Offering**" has the meaning set forth in **Section 15.17(a)**.

"**IPO Entity**" has the meaning set forth in **Section 15.17(a)**.

"**Issuance Notice**" has the meaning set forth in **Section 9.01(c)**.

"**Joinder Agreement**" means the joinder agreement in form and substance attached hereto as Exhibit A.

"**Liquidator**" has the meaning set forth in **Section 13.03(a)**.

"**Losses**" has the meaning set forth in **Section 14.03(a)**.

"**Management Company Group**" means the Company, J.S. Held Holdings, and each of their respective direct and indirect parents, partners, Subsidiaries and Affiliates.

"**Manager**" means the Managing Member.

"**Management Member**" means any Member other than the Managing Member.

"**Managing Member**" means J.S. Held Holdings IV-A LLC, a Delaware limited liability company.

"**Member**" means (a) each Person who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulation Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in **Section** 3.01.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, (a) to a Distributive share of Net Income, Net Losses and other items of

income, gain, loss and deduction of the Company; (b) to a Distributive share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the Delaware Act.

"**Misallocated Item**" has the meaning set forth in **Section** 6.05.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(g)      any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(h)      any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(i)      any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(j)      any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*g*);

(k)      if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(l)      to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704 1(b)(2)(iv)(*m*), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**New Common Securities**" has the meaning set forth in **Section 9.01(b)(ii)**.

"**New Interests**" has the meaning set forth in **Section** 3.07.

"**New Preferred Securities**" has the meaning set forth in **Section 9.01(b)(i)**.

9

"**New Securities**" has the meaning set forth in **Section 9.01(b)(iii)**.

"**Non-Exercising Member**" has the meaning set forth in **Section 9.01(e)**.

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Officers**" has the meaning set forth in **Section** 8.02.

"**Other Business**" has the meaning set forth in **Section 11.02**.

"**Over-allotment Exercise Period**" has the meaning set forth in **Section 9.01(e)**.

"**Over-allotment Notice**" has the meaning set forth in **Section 9.01(e)**.

"**Permitted Transfer**" means a Transfer of Common Units carried out pursuant to **Section** 10.02.

"**Permitted Transferee**" means a recipient of a Permitted Transfer.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pre-emptive Member**" has the meaning set forth in **Section 9.01(a)**.

"**Profits Interest**" has the meaning set forth in **Section 3.05(h)**.

"**Profits Interest Hurdle**" means an amount set forth in each Award Agreement reflecting the P Series Liquidation Value (or a multiple thereof) of the relevant P Series of Class C Common Units at the time the Units are issued as determined by the Managing Member.

"**P Series**" has the meaning set forth in **Section 3.05(b)**.

"**P Series Liquidation Value**" means, as of the date of determination and with respect to the relevant new P Series of Class C Common Units to be issued, the aggregate amount that would be Distributed to the Members pursuant to **Section** 7.02, if, immediately prior to the issuance of the relevant new P Series of Class C Common Units, the Company sold all of its assets for Fair Market Value and immediately liquidated, the Company's debts and liabilities were satisfied and the proceeds of the liquidation were Distributed pursuant to **Section 13.03(c)**.

"**Prospective Purchaser**" has the meaning set forth in **Section 9.01(c)**.

"**Public Offering**" means any underwritten public offering pursuant to a registration statement filed in accordance with the Securities Act.

"**Purchase Notice**" has the meaning set forth in **Section 10.04(b)(i)**.

"**Purchased Incentive Units**" has the meaning set forth in **Section 10.04(b)(i)**.

DB1/ 82337237.6

"**Qualified Public Offering**" means the sale, in a firm commitment underwritten public offering led by a nationally recognized underwriting firm pursuant to an effective registration statement under the Securities Act, of Units (or common stock of the Company or an IPO Entity) having an aggregate offering value (net of underwriters' discounts and selling commissions) of at least $50,000,000, following which at least 25% of the total Units (or common stock of the Company or an IPO Entity) on a Fully Diluted Basis shall have been sold to the public and shall be listed on any national securities exchange or quoted on the NASDAQ Stock Market System.

"**Qualifying Incentive Units**" has the meaning set forth in **Section** 7.03.

"**Quarterly Estimated Tax Amount**" of a Member for any calendar quarter of a Fiscal Year means the excess, if any of (a) the product of (i) a quarter (¼) in the case of the first calendar quarter of the Fiscal Year, half (½) in the case of the second calendar quarter of the Fiscal Year, three-quarters (¾) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year over (b) all Distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in **Section 6.02(d)**.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Incentive Units**" has the meaning set forth in **Section 3.05(f)(i)**.

"**Restricted Period**" has the meaning set forth in **Section 11.03(a)**.

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"**Service Provider**" has the meaning set forth in **Section 3.05(f)**.

"**Shortfall Amount**" has the meaning set forth in **Section 7.04(b)**.

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in **Section 7.04(a)**.

"**Tax Amount**" of a Member for a Fiscal Year means the product of (a) the Tax Rate for such Fiscal Year and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Units.

"**Tax Matters Member**" has the meaning set forth in **Section** 12.01.

"**Tax Rate,**" as applied to each Member, for any period, means the highest marginal blended federal, state and local tax rate applicable to ordinary income, qualified dividend income

or capital gains, as appropriate, for such period for any of the Members (or its direct or indirect owners), taking into account for federal income tax purposes, the deductibility of state and local taxes and any applicable limitations on such deductions, which rate shall be determined by the Managing Member.

"**Taxing Authority**" has the meaning set forth in **Section 7.05(b)**.

"**Third Party Purchaser**" means any Person who, immediately prior to the contemplated transaction, (a) does not directly or indirectly own or have the right to acquire any outstanding Common Units (or applicable Unit Equivalents) or (b) is not a Permitted Transferee of any Person who directly or indirectly owns or has the right to acquire any Common Units (or applicable Unit Equivalents).

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units or Unit Equivalents owned by a Person. "**Transfer**" when used as a noun shall have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Unallocated Item**" has the meaning set forth in **Section** 6.05.

"**Underlying Units**" has the meaning set forth in Section 3.05(e).

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including but not limited to the Class A Common Units, Class B Common Units and Class C Common Units and any other units hereinafter issued by the Company; *provided*, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Unit Equivalents**" means any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Units, and any option, warrant or other right to subscribe for, purchase or acquire Units.

"**Unrestricted Incentive Units**" has the meaning set forth in **Section 3.05(f)(ii)**.

"**Voting Members**" has the meaning set forth in **Section 4.07(b)**.

"**Voting Units**" has the meaning set forth in **Section 4.07(a)**.

12

"**Withholding Advances**" has the meaning set forth in **Section 7.05(b)**.

**Section 1.02   Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

# ARTICLE II
## ORGANIZATION

**Section 2.01   Formation.**

(a)      The Company was formed on February 25, 2015, pursuant to the provisions of the Delaware Act, upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware.

(b)      This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

**Section 2.02   Name.** The name of the Company is "J.S. Held Management LLC" or such other name or names as the Managing Member may from time to time designate; *provided*, that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC." The Managing Member shall give prompt notice to each of the Members of any change to the name of the Company.

**Section 2.03   Principal Office.** The principal office of the Company is located at 277 Willis Avenue, Roslyn Heights, New York 11577, or such other place as may from time to time be determined by the Managing Member.

**Section 2.04   Registered Office; Registered Agent.**

13

(a)      The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)      The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 2.05   Purpose; Powers.**

(a)      The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and to engage in any and all activities necessary or incidental thereto.

(b)      The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

**Section 2.06   Term.** The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

**Section 2.07   No State-Law Partnership.** The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this **Section** 2.07.

## ARTICLE III
### UNITS

**Section 3.01   Units Generally.** The Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series. Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. The Managing Member  shall maintain a schedule of all Members, their respective mailing addresses and the amount and series of Units held by them (the "**Members Schedule**"), and shall update the Members Schedule upon the issuance or Transfer of any Units to any new or existing Member.  The Members Schedule shall be kept confidential.

14

**Section 3.02   Authorization and Issuance of Class A Common Units.** Subject to compliance with **Section** 9.01, the Company is hereby authorized to issue a class of Units designated as Class A Common Units.

**Section 3.03   Authorization and Issuance of Class B Common Units.** Subject to compliance with **Section** 9.01, the Company is hereby authorized to issue a class of Units designated as Class B Common Units.

**Section 3.04   Authorization and Issuance of Class C Common Units.** Subject to compliance with **Section** 9.01, the Company is hereby authorized to issue a class of Units designated as Class C Common Units.

**Section 3.05   Incentive Units.**

(a)      Subject to **Section 3.03** and upon the terms and conditions set forth in any applicable Award Agreements or employment agreements with any member of the Management Company Group, the Company may issue Class B Common Units to Service Providers; *provided that* (i) Class B Common Units shall only be issued to a Person that is an employee of or performs services for a member of the Management Company Group, with any such issuance to be consistent with the terms of the Incentive Plan and any Award Agreement to such Person; (ii) Class B Common Units shall be issued by the Company only in conjunction with a corresponding issuance of Class B Common Units in J.S. Held Holdings, LLC ("**J.S. Held Holdings**") to the Company; and (iii) the number of Class B Common Units outstanding shall be reduced, from time to time, as the Managing Member determines appropriate in good faith to reflect any reduction in the number of Class B Common Units held by any Member, including as a result of forfeiture or repurchase pursuant to the terms of this Agreement, the Incentive Plan, any Award Agreement or otherwise.  Class B Common Units that have been forfeited or repurchased may be re-issued at any time.

(b)      Subject to **Section 3.04** and upon the terms and conditions set forth in any applicable Award Agreements or employment agreements approved by the Managing Member, the Company may issue a profit interest series of Class C Common Units to Service Providers (each a "**P Series**" of Class C Common Units, to be consecutively designated as "Series P-1," "Series P-2," etc.) *provided that* (i) P Series of Class C Common Units shall only be issued to a Person that is an employee of or performs services for a member of the Management Company Group, with any such issuance to be consistent with the terms of the Incentive Plan and any Award Agreement to such Person; (ii) P Series of Class C Common Units shall be issued by the Company only in conjunction with a corresponding issuance of P Series of Class C Common Units in J.S Held Holdings to the Company; and (iii) the number of P Series of Class C Common Units outstanding shall be reduced, from time to time, as the Managing Member determines appropriate in good faith to reflect and reduction in the number of P Series of Class C Common Units held by any Member, including as a result of forfeiture or repurchase pursuant to the terms of this Agreement, the Incentive Plan, any Award Agreement or otherwise.  P Series of Class C Common Units that have been forfeited or repurchased may be re-issued at any time.

(c)      The Managing Member is hereby authorized and directed to adopt a written plan pursuant to which all such Incentive Units shall be granted in compliance with Rule 701 of the

15

Securities Act or another applicable exemption (such plan as in effect from time to time, the "**Incentive Plan**"). In connection with the adoption of the Incentive Plan and issuance of Incentive Units, the Managing Member is hereby authorized to negotiate and enter into award agreements with each Service Provider to whom it grants Incentive Units (such agreements, "**Award Agreements**"). Each Award Agreement shall include such terms, conditions, rights and obligations as may be determined by the Managing Member, in its sole discretion, consistent with the terms herein.

(d)     The Managing Member may cause the Company from time to time to repurchase from any Member all or any Incentive Units for which repurchase rights are triggered pursuant to **Section 10.04** of this Agreement, the Incentive Plan or related Award Agreements, at a purchase price stipulated herein and therein.  Any Incentive Units so repurchased shall automatically be fully redeemed and no longer outstanding.

(e)     It is acknowledged and agreed by the Company and each Member that (i) the Incentive Units are intended to represent an indirect interest in the Incentive Units of J.S. Held Holdings issued to the Company in conjunction with the corresponding issuance of such Incentive Units (such Units, the "**Underlying Units**"); and (ii) unless otherwise determined by the Managing Member, it is intended that the rights, preferences, conditions, obligations and limitations on the Class B Common Units and Class C Common Units issued under this Agreement are intended to correspond to the equivalent rights, preferences, conditions, obligations and limitations of the Underlying Units (provided that the foregoing shall not prevent the Company or Managing Member from exercising any rights under this Agreement, including using distributions made with respect to the Underlying Units to make any payments, or establish any reserves, permitted to be made or established under this Agreement).  All determinations regarding the application of this **Section 3.05(e)** shall be made by the Managing Member in its sole discretion, which determinations shall be final and conclusive as to all Members.

(f)     The Managing Member shall have the power and discretion to approve which Managers, Officers, employees, consultants, independent contractors, advisors or other service providers of the Management Company Group (each, a "**Service Provider**") shall be offered and issued Incentive Units and shall establish such vesting criteria for the Incentive Units as it determines in its discretion and shall include such vesting criteria in the Incentive Plan and/or the applicable Award Agreement for any grant of Incentive Units. As used in this Agreement:

(i)     any Incentive Units that have not vested pursuant to the terms of the Incentive Plan and any associated Award Agreement are referred to as "**Restricted Incentive Units**"; and

(ii)     any Incentive Units that have vested pursuant to the terms of the Incentive Plan and any associated Award Agreement are referred to as "**Unrestricted Incentive Units.**"

(g)     Immediately prior to each issuance of each P Series of Class C Common Units following the initial issuance described in the second sentence of **Section 3.05(c)**, the Managing Member shall determine in good faith the P Series Liquidation Value. In each Award Agreement that the Company enters into with a Service Provider for the issuance of each new P Series of Class C Common Units, the Managing Member shall include an appropriate Profits Interest

16

Hurdle for such Incentive Units on the basis the P Series Liquidation Value (or a multiple thereof) immediately prior to the issuance of such Incentive Units as determined by the Managing Member.

(h)     The Company and each Member hereby acknowledge and agree that all P Series of Class C Common Units constitute a "profits interest" in the Company within the meaning of Rev. Proc. 93-27 (a "**Profits Interest**"), and that any and all P Series of Class C Common Units received by Service Providers are received in exchange for the provision of services by the Service Provider to or for the benefit of the Management Company Group in a Service Provider capacity or in anticipation of becoming a Service Provider. The Company and each Service Provider which receives P Series of Class C Common Units hereby agree to comply with the provisions of Rev. Proc. 2001-43, and neither the Company nor any Service Provider who receives any P Series of Class C Common Units shall perform any act or take any position inconsistent with the application of Rev. Proc. 2001-43 or any future Internal Revenue Service guidance or other Governmental Authority that supplements or supersedes the foregoing Revenue Procedures.

(i)     Incentive Units granted to a Service Provider shall receive the following tax treatment:

(i)     the Company and each Service Provider who receives Incentive Units shall treat such Service Provider as the owner of such Incentive Units from the date of their receipt, and the Service Provider receiving such Incentive Units shall take into account his or her Distributive share of Net Income, Net Loss, income, gain, loss and deduction associated with the Incentive Units in computing such Service Provider's income tax liability for the entire period during which such Service Provider holds Incentive Units;

(ii)     each Service Provider that receives Class B Common Units may, and each Service Provider that receives P Series of Class C Common Units shall be obligated to, make a timely and effective election under Code Section 83(b) with respect to such Incentive Units received by such Service Provider, and shall promptly provide a copy of any such election which is made to the Company. Except as otherwise determined by the Managing Member, both the Company and all Members shall (A) treat such Class B Common Units (if a Code Section 83(b) election has been made with respect thereto or such Class B Common Units are vested) and such P Series Class C Common Units (whether or not vested) as outstanding for tax purposes, (B) treat such Service Provider as a partner for tax purposes with respect to such Class B Common Units (if a Code Section 83(b) election has been made with respect thereto or such Class B Common Units are vested) and such P Series Class C Common Units (whether or not vested) and (C) file all tax returns and reports consistently with the foregoing. The Company shall recognize, and allocate to its Members in accordance with this Agreement, a deduction with respect to each such Class B Common Unit, as of the date of issuance of such Class B Common Unit (if a Code Section 83(b) election has been made) or otherwise as of the date such Class B Common Unit is vested, reflecting the compensatory income attributable to such Class B Common Unit, as if a compensatory cash payment had been made to the holder of such Class B Common Unit as of such date by the Company, followed immediately by a cash Capital Contribution by such holder to the Company in exchange for such Class B Common Unit. Neither the Company nor any of its Members shall deduct any amount (as wages, compensation or otherwise) with respect to the

17

receipt of such P Series Class C Common Units (whether or not vested) for federal income tax purposes; and

(iii)    in accordance with the finally promulgated successor rules to Proposed Regulations Section 1.83-3(l) and IRS Notice 2005-43, each Member, by executing this Agreement, authorizes and directs the Company to elect a safe harbor under which the fair market value of any P Series of Class C Common Units issued after the effective date of such Proposed Regulations (or other guidance) will be treated as equal to the liquidation value (within the meaning of the Proposed Regulations or successor rules) of the P Series of Class C Common Units as of the date of issuance of such P Series of Class C Common Units. In the event that the Company makes a safe harbor election as described in the preceding sentence, each Member hereby agrees to comply with all safe harbor requirements with respect to Transfers of Units while the safe harbor election remains effective.

**Section 3.06   No Pre-Emptive Rights for Class C Common Units.** For the avoidance of doubt, (i) no Class C Common Units granted to Service Providers, including Unrestricted Incentive Units, shall have any pre-emptive right to acquire New Securities pursuant to **Section 9.01(a)** and (ii) no Class B Common Units or Class C Common Units shall have any right to vote any matter on which all the Members are entitled to vote.  All Incentive Units granted to the Members, including Unrestricted Incentive Units, shall be subject to the rights of the Managing Member to drag along the holders of Incentive Units pursuant to **Section** 10.03.

**Section 3.07   Other Issuances.** In addition to Common Units and Incentive Units, the Company is hereby authorized, subject to compliance with **Section** 9.01, to authorize and issue or sell to any Person any of the following (collectively, "**New Interests**"): (i) any new type, class or series of Units not otherwise described in this Agreement, which Units may be designated as classes or series of the preferred Units, Common Units or Incentive Units but having different rights; and (ii) Unit Equivalents. The Managing Member is hereby authorized, subject to **Section** 15.09, to amend this Agreement to reflect such issuance and to fix the relative privileges, preference, duties, liabilities, obligations and rights of any such New Interests, including the number of such New Interests to be issued, the preference (with respect to Distributions, in liquidation or otherwise) over any other Units and any contributions required in connection therewith.

**Section 3.08   Certification of Units.**

(a)    The Managing Member in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member.

(b)    In the event that the Managing Member shall issue certificates representing Units in accordance with **Section 3.08(a)**, then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE

COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED  EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

## ARTICLE IV
### MEMBERS

**Section 4.01   Admission of New Members.**

(a)      New Members may be admitted by the Managing Member from time to time (i) in connection with an issuance of Units by the Company, subject to compliance with the provisions of **Section** 9.01, as applicable, and (ii) in connection with a Transfer of Units, subject to compliance with the provisions of **Article X**, and in either case, following compliance with the provisions of **Section 4.01(b)**.

(b)      In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or Transfer of Units, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement. Upon the amendment of the Members Schedule by the Managing Member and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units. The Managing Member shall also adjust the Capital Accounts of the Members as necessary in accordance with **Section** 5.03.

**Section 4.02   Representations and Warranties of Members.** By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members (other than the Managing Member with respect to **Sections 4.02(d), 4.02(e) and 4.02(f)**), whether admitted as of the date hereof or pursuant to **Section** 4.01, represents and warrants to the Company and acknowledges that:

(a)      The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with;

(b)      Other than the Members set forth on <u>Schedule A</u>, such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees

that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Units;

(c)     Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof;

(d)     Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company for such purpose;

(e)     The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Company Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member;

(f)     Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(g)     Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(h)     The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound;

(i)     This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity); and

(j)     Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or any Company Subsidiary or affect the right of the Company or any Company Subsidiary to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company or Company Subsidiary, if applicable.

**Section 4.03   No Personal Liability.** Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Member will be obligated personally for

any debt, obligation or liability of the Company or of any Company Subsidiaries or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

**Section 4.04   No Withdrawal.** A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act. So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member; *provided*, *however*, that this Agreement shall continue to apply with respect to any Units that have been called in accordance with **Section 10.04** until full payment is made therefor in accordance with the terms of this Agreement.

**Section 4.05   Death.** The death of any Member shall not cause the dissolution of the Company. In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; *provided*, that within a reasonable time after such Transfer, the applicable heirs shall sign a written undertaking substantially in the form of the Joinder Agreement.

**Section 4.06   Voting.** Except as otherwise provided by this Agreement (including **Section** 15.09) or as otherwise required by the Delaware Act or Applicable Law, on all matters on which all the Members are entitled to vote:

(i)      each holder of a Class A Common Unit shall be entitled to one vote per Class A Common Unit of which such Member is the record owner; and

(ii)      the holders of Class B Common Units and Class C Common Units shall not be entitled to vote.

**Section 4.07   Meetings.**

(a)      **Voting Units.** As used herein, the term "**Voting Units**" shall mean the Class A Common Units, for purposes of calling or holding any meeting of the Members holding Class A Common Units, providing notice of such a meeting, forming a quorum for such a meeting, or taking any action by vote at a meeting or by written consent without a meeting.

(b)      **Calling the Meeting.** Meetings of the Members may be called by the Managing Member. Only Members who hold the relevant Voting Units ("**Voting Members**") shall have the right to attend meetings of the Members.

(c)      **Notice.** Written notice stating the place, date and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than one (1) day and not more than thirty (30) days before the date of the meeting to each Voting Member, by or at the direction of the Managing Member, as the case may be. The Voting Members may hold meetings at the

21

Company's principal office or at such other place as the Managing Member may designate in the notice for such meeting.

(d)   **Participation.** Any Voting Member may participate in a meeting of the Voting Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(e)   **Vote by Proxy.** On any matter that is to be voted on by Voting Members, a Voting Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law. Every proxy shall be revocable in the discretion of the Voting Member executing it unless otherwise provided in such proxy; *provided*, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.

(f)   **Conduct of Business.** The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Voting Members holding Common Units; *provided*, that the appropriate Voting Members shall have been notified of the meeting in accordance with **Section 4.07(c)**. Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Section 4.08   **Quorum.** A quorum of any meeting of the Voting Members shall require the presence of the Members holding a majority of the appropriate Voting Units held by all Members. Subject to **Section** 4.09, no action at any meeting may be taken by the Members unless the appropriate quorum is present. Subject to **Section** 4.09, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of Members holding a majority of the appropriate Voting Units held by all Members.

Section 4.09   **Action Without Meeting.** Notwithstanding the provisions of **Section** 4.08, any matter that is to be voted on, consented to or approved by Voting Members may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of the appropriate Voting Units held by all Members. A record shall be maintained by the Managing Member of each such action taken by written consent of a Member or Members.

Section 4.10   **Power of Members.** The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Delaware Act. Except as otherwise specifically provided by this Agreement or required by the Delaware Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

Section 4.11   **No Interest in Company Property.** No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby

irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

## ARTICLE V
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 5.01   Initial Capital Accounts.** Contemporaneously with the execution of this Agreement, each Member shall have an initial Capital Account and shall own the number, type, series and class of Units, in each case, in the amounts set forth opposite such Initial Member's name on the Members Schedule as in effect on the date hereof.  The Managing Member shall make an initial Capital Contribution of $1,000.

**Section 5.02   Additional Capital Contributions.**

(a)      No Member shall be required to make any additional Capital Contributions to the Company. Any future Capital Contributions made by any Member shall only be made with the consent of the Managing Member and in connection with an issuance of Units made in compliance with **Section** 9.01.

(b)      No Member shall be required to lend any funds to the Company and no Member shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

**Section 5.03   Maintenance of Capital Accounts.** The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this **Section** 5.03. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)      Each Member's Capital Account shall be increased by the amount of:

(i)      such Member's Capital Contributions, including such Member's initial Capital Contribution;

(ii)      any Net Income or other item of income or gain allocated to such Member pursuant to **Article** VI; and

(iii)      any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

(b)      Each Member's Capital Account shall be decreased by:

(i)      the cash amount or Book Value of any property Distributed to such Member pursuant to **Article** VII and **Section 13.03(c)**;

(ii)      the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to **Article** VI; and

23

(iii)      the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

**Section 5.04   Succession Upon Transfer.** In the event that any Units are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to **Section** 6.04, shall receive allocations and Distributions pursuant to **Article** VI, **Article** VII and **Article** XIII in respect of such Units.

**Section 5.05   Negative Capital Accounts.** In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 5.06   No Withdrawal.** No Member shall be entitled to withdraw any part of his, her or its Capital Account or to receive any Distribution from the Company, except as provided in this Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

**Section 5.07   Treatment of Loans From Members.** Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in **Section 5.03(a)(iii)**, if applicable.

**Section 5.08   Modifications.** The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Managing Member determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Managing Member may authorize such modifications.

## ARTICLE VI
### ALLOCATIONS

**Section 6.01   Allocation of Net Income and Net Loss.** For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in **Section** 6.02, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (i) the Distributions that would be made to such Member pursuant to **Section 13.03(c)** if the Company were dissolved, its affairs

wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Company were Distributed, in accordance with **Section 13.03(c)**, to the Members immediately after making such allocations, minus (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets; *provided*, *however*, that notwithstanding any other provision of this Agreement, the Managing Member may make such allocations of Net Income or Net Loss (or items thereof) as it deems reasonably necessary to give economic effect to the provisions of this Agreement, taking into such facts and circumstances as it deems reasonably necessary for this purpose.

**Section 6.02   Regulatory and Special Allocations.** Notwithstanding the provisions of **Section** 6.01:

(a)     If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This **Section 6.02(a)** is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This **Section 6.02(b)** is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or Distributions as quickly as possible. This **Section 6.02(c)** is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

(d)     The allocations set forth in paragraphs (a), (b) and (c) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this **Article** VI (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net

25

Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

(e)     The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulation Section 1.704-1(b)(4)(xii)(*c*) ("**Forfeiture Allocations**") result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make Forfeiture Allocations and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulation Section 1.704-1(b)(4)(xii)(*c*) or any successor provision or guidance.

**Section 6.03    Tax Allocations.**

(a)     Subject to **Section 6.03(b)** through **Section 6.03(e)**, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)     Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*f*) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)     Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Managing Member taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     The Company shall make allocations pursuant to this Section 6.03 in accordance with such method or methods as may be adopted for the Company by the Tax Matters Member pursuant to Code Section 704(c).

(f)     Allocations pursuant to this **Section** 6.03 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any

Member's Capital Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

**Section 6.04   Allocations in Respect of Transferred Units.** In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of **Article X**, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

**Section 6.05   Curative Allocations.** In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is not specified in this **Article** VI (an "**Unallocated Item**"), or that the allocation of any item of Company income, gain, loss or deduction hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)) (a "**Misallocated Item**"), then the Managing Member may allocate such Unallocated Items, or reallocate such Misallocated Items, to reflect such economic interests; *provided*, that no such allocation will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby; and *provided*, *further*, that no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

## ARTICLE VII
### DISTRIBUTIONS

**Section 7.01   General.**

(a)      Subject to **Section 7.01(b)**, **Section** 7.02 and **Section 7.04**, the Managing Member shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forego payment of Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

(b)      Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate § 18-607 of the Delaware Act or other Applicable Law.

**Section 7.02   Priority of Distributions.** After making all Distributions required for a given Fiscal Year under **Section 7.04** and subject to the priority of Distributions pursuant to **Section 13.03(c**), if applicable, all Distributions determined to be made by the Managing Member pursuant to **Section** 7.01 shall be made in the following manner:

(a)     first, to the Members pro rata in proportion to their holdings of Class A Common Units and Class B Common Units, until Distributions under this **Section 7.02(a)** equal the aggregate amount of Capital Contributions attributable to the Members in respect of their acquisition of Common Units; and

(b)     second, any remaining amounts to the Members holding all Class B Common Units and Class C Common Units (subject to the limitations on Class C Common Units set forth in **Section 7.03**) pro rata in proportion to their aggregate holdings of Common Units treated as one class of Units.

**Section 7.03   Limitations on Class C Common Units.** It is the intention of the parties to this Agreement that Distributions to any Service Provider with respect to P Series of Class C Common Units be limited to the extent necessary so that the related Membership Interest constitutes a Profits Interest. In furtherance of the foregoing, and notwithstanding anything to the contrary in this Agreement, the Managing Member shall, if necessary, limit any Distributions to any Service Provider with respect to P Series of Class C Common Units so that such Distributions do not exceed the available profits in respect of such Service Provider's related Profits Interest. Available profits shall include the aggregate amount of profit and unrealized appreciation in all of the assets of the Company between the date of issuance of such P Series of Class C Common Units and the date of such Distribution, it being understood that such unrealized appreciation shall be determined on the basis of the Profits Interest Hurdle applicable to such P Series of Class C Common Unit. In the event that a Service Provider's Distributions and allocations with respect to P Series of Class C Common Units are reduced pursuant to the preceding sentence, an amount equal to such excess Distributions shall be treated as instead apportioned to the holders of Class A Common Units, Class B Common Units and P Series of Class C Common Units that have met their Profits Interest Hurdle (such P Series of Class C Common Units, "**Qualifying Incentive Units**"), pro rata in proportion to their aggregate holdings of Class A Common Units, Class B Common Units and Qualifying Incentive Units treated as one class of Units.

**Section 7.04   Tax Advances.**

(a)     Subject to any restrictions in any of the Company's and/or any member of the Management Company Group's then applicable debt-financing arrangements, and subject to the Managing Member's sole discretion to retain any other amounts necessary to satisfy the Company's and/or the Company Subsidiaries' obligations, at least five (5) days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to Distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such Distribution, a "**Tax Advance**").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been Distributed pursuant to **Section 7.04(a)** with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to Distribute cash in proportion to and to the extent of each Member's Shortfall Amount. The Company shall use commercially reasonable efforts to Distribute

Shortfall Amounts with respect to a Fiscal Year before the 75th day of the next succeeding Fiscal Year; *provided*, that if the Company has made Distributions other than pursuant to this **Section 7.04**, the Managing Member may apply such Distributions to reduce any Shortfall Amount.

(c)     If the aggregate Tax Advances made to any Member pursuant to this **Section 7.04** for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this **Section 7.04**, except to the extent taken into account as an advance pursuant to **Section 7.04(d)**.

(d)     Any Distributions made pursuant to this **Section 7.04** shall be treated for purposes of this Agreement as advances on Distributions pursuant to **Section** 7.02 and shall reduce, dollar-for-dollar, the amount otherwise Distributable to such Member pursuant to **Section** 7.02.

**Section 7.05   Tax Withholding; Withholding Advances.**

(a)     **Tax Withholding.** If requested by the Managing Member, each Member shall, if able to do so, deliver to the Managing Member:

(i)     an affidavit in form satisfactory to the Managing Member that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii)     any certificate that the Managing Member may reasonably request with respect to any such laws; and/or

(iii)     any other form or instrument reasonably requested by the Managing Member relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Managing Member the affidavit described in **Section 7.05(a)(i)**, the Managing Member may withhold amounts from such Member in accordance with **Section 7.05(b)**.

(b)     **Withholding Advances.** The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member and to withhold the same from Distributions to such Member. Any funds withheld from a Distribution by reason of this **Section 7.05(b)** shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Managing Member, shall be charged against the Member's Capital Account.

(c)     **Repayment of Withholding Advances.** Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall, with interest thereon accruing from the date of payment at a

rate equal to the prime rate published in the *Wall Street Journal* on the date of payment plus two percent (2.0%) per annum:

(i)     be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Managing Member shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii)    with the consent of the Managing Member, be repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but which shall not further reduce the Member's Capital Account if the Managing Member shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d)    **Indemnification.** Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member. The provisions of this **Section 7.05(d)** and the obligations of a Member pursuant to **Section 7.05(c)** shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this **Section** 7.05, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e)    **Overwithholding.** Neither the Company nor the Managing Member shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

### Section 7.06   Distributions in Kind.

(a)    The Managing Member is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company; *provided*, that Tax Advances shall only be made in cash. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Members pursuant to **Section** 7.02.

(b)    Any Distribution of securities shall be subject to such conditions and restrictions as the Managing Member determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Managing Member may require that the Members execute and deliver such documents as the Managing Member may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities, and may appropriately legend

the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE VIII
### MANAGEMENT

**Section 8.01   Management of the Company.** The business and affair of the Company shall be managed by or under the direction of the Managing Member.  The Managing Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company.  Any action taken by the Managing Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Managing Member as set forth in this Agreement.  The Managing Member shall have all rights and powers of a manager under the Delaware Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

**Section 8.02   Officers.** The Managing Member may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Managing Member may delegate to such Officers such power and authority as the Managing Member deems advisable. No Officer need be a Member or Manager. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his or her successor is designated by the Managing Member or until his or her earlier death, resignation or removal. Any Officer may resign at any time upon written notice to the Managing Member. Any Officer may be removed by the Managing Member with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Managing Member.

**Section 8.03   No Personal Liability.** Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Officer or Manager will be obligated personally for any debt, obligation or liability of the Company or of any Company Subsidiaries, whether arising in contract, tort or otherwise, solely by reason of being an Officer or Manager.

## ARTICLE IX
### PRE-EMPTIVE RIGHTS

**Section 9.01   Pre-emptive Right.**

(a)      **Issuance of New Securities.** The Company hereby grants to each holder of Class A Common Units and Class B Common Units (each, a "**Pre-emptive Member**") the right to purchase its Common Pro Rata Portion of any New Securities that the Company may from time to time propose to issue or sell to any party between the date hereof and the consummation of a Qualified Public Offering.

(b)      **Definition of New Securities.** As used herein:

31

(i)      the term "**New Preferred Securities**" shall mean any preferred Units and any Unit Equivalents convertible into preferred Units, exchangeable or exercisable for preferred Units, or providing a right to subscribe for, purchase or acquire preferred Units;

(ii)      the term "**New Common Securities**" shall mean any authorized but unissued Common Units and any Unit Equivalents convertible into Common Units, exchangeable or exercisable for Common Units, or providing a right to subscribe for, purchase or acquire Common Units; and

(iii)      the term "**New Securities**" shall mean the New Preferred Securities and the New Common Securities, as applicable, except that in an issuance and sale of Class A Common Units (or other voting Units of the Company), the term "New Securities" with respect to any Pre-Emptive Member holding Class B Common Units shall mean Class B Common Units (or other non-voting Units of the Company);

*provided*, that neither the term "New Preferred Securities" nor the term "New Common Securities" shall include Units or Unit Equivalents issued by the Company in connection with: (A) a grant to any existing or prospective Service Providers pursuant to any Incentive Plan or similar equity-based plans or other compensation agreement; (B) the conversion or exchange of any securities of the Company into Units, or the exercise of any warrants or other rights to acquire Units; (C) any acquisition by the Company or any Company Subsidiary of any equity interests, assets, properties or business of any Person which is approved by the Managing Member and for which no proceeds from the issuance of any such New Securities are received by the Company; (D) any merger, consolidation or other business combination involving the Company or any Company Subsidiary which is approved by the Managing Member and for which no proceeds from the issuance of any such New Securities are received by the Company; (E) the commencement of any Public Offering or any transaction or series of related transactions involving a Change of Control; (F) any subdivision of Units (by a split of Units or otherwise), payment of Distributions or any similar recapitalization; (G) any private placement of warrants to purchase Membership Interests to lenders or other institutional investors (excluding the Members) in any arm's length transaction in which such lenders or investors provide debt financing to the Company or any Company Subsidiary; or (H) a joint venture, strategic alliance or other commercial relationship with any Person (including Persons that are customers, suppliers and strategic partners of the Company or any Company Subsidiary) relating to the operation of the Company's or any Company Subsidiary's business and not for the primary purpose of raising equity capital.

(c)      **Additional Issuance Notices.** The Company shall give written notice (an "**Issuance Notice**") of any proposed issuance or sale described in **Section 9.01(a)** to the Pre-emptive Members within one (1) Business Day following any meeting of the Managing Member at which any such issuance or sale is approved. The Issuance Notice shall, if applicable, be accompanied by a written offer from any prospective purchaser seeking to purchase New Securities (a "**Prospective Purchaser**") and shall set forth the material terms and conditions of the proposed issuance or sale, including:

(i)      the number and description of the New Securities proposed to be issued and the percentage of the Company's Units then outstanding on a Fully Diluted Basis (both in

the aggregate and with respect to each class or series of Units proposed to be issued) that such issuance would represent;

(ii)     the proposed issuance date, which shall be at least twenty (20) days from the date of the Issuance Notice;

(iii)     the proposed purchase price per unit of the New Securities; and

(iv)     if the consideration to be paid by the Prospective Purchaser includes non-cash consideration, the Managing Member's good-faith determination of the Fair Market Value thereof.

(d)     **Exercise of Pre-emptive Rights.** Each Pre-emptive Member shall for a period of five (5) days following the receipt of an Issuance Notice (the "**Exercise Period**") have the right to elect irrevocably to purchase all or any portion of its Common Pro Rata Portion of any New Securities, as applicable, at the respective purchase prices set forth in the Issuance Notice by delivering a written notice to the Company (an "**Acceptance Notice**") specifying the number of New Securities it desires to purchase. The delivery of an Acceptance Notice by a Pre-emptive Member shall be a binding and irrevocable offer by such Member to purchase the New Securities described therein. The failure of a Pre-emptive Member to deliver an Acceptance Notice by the end of the Exercise Period shall constitute a waiver of its rights under this **Section** 9.01 with respect to the purchase of such New Securities, but shall not affect its rights with respect to any future issuances or sales of New Securities.

(e)     **Over-allotment.** No later than five (5) days following the expiration of the Exercise Period, the Company shall notify each Pre-emptive Member in writing of the number of New Securities that each Pre-emptive Member has agreed to purchase (including, for the avoidance of doubt, where such number is zero) (the "**Over-allotment Notice**"). Each Pre-emptive Member exercising its rights to purchase its Common Pro Rata Portion of the New Securities in full (an "**Exercising Member**") shall have a right of over-allotment such that if any other Pre-emptive Member has failed to exercise its right under this **Section** 9.01 to purchase its full Common Pro Rata Portion of the New Securities (each, a "**Non-Exercising Member**"), such Exercising Member may purchase its Common Pro Rata Portion of such Non-Exercising Member's allotment by giving written notice to the Company within five (5) days of receipt of the Over-allotment Notice (the "**Over-allotment Exercise Period**").

(f)     **Sales to the Prospective Purchaser.** Following the expiration of the Exercise Period and, if applicable, the Over-allotment Exercise Period, the Company shall be free to complete the proposed issuance or sale of New Securities described in the Issuance Notice with respect to which Pre-emptive Members declined to exercise the pre-emptive right set forth in this **Section** 9.01 on terms no less favorable to the Company than those set forth in the Issuance Notice (except that the amount of New Securities to be issued or sold by the Company may be reduced); *provided*, that: (i) such issuance or sale is closed within thirty (30) Business Days after the expiration of the Exercise Period and, if applicable, the Over-allotment Exercise Period (subject to the extension of such thirty (30) Business Day period for a reasonable time not to exceed sixty (60) Business Days to the extent reasonably necessary to obtain any third-party approvals); and (ii) for the avoidance of doubt, the price at which the New Securities are sold to

33

the Prospective Purchaser is at least equal to or higher than the purchase price described in the Issuance Notice. In the event the Company has not sold such New Securities within such time period, the Company shall not thereafter issue or sell any New Securities without first again offering such securities to the Members in accordance with the procedures set forth in this **Section** 9.01.

(g)      **Closing of the Issuance.** The closing of any purchase by any Pre-emptive Member shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice. Upon the issuance or sale of any New Securities in accordance with this **Section** 9.01, the Company shall deliver the New Securities free and clear of any liens (other than those arising hereunder and those attributable to the actions of the purchasers thereof), and the Company shall so represent and warrant to the purchasers thereof, and further represent and warrant to such purchasers that such New Securities shall be, upon issuance thereof to the Exercising Members and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. The Company, in the discretion of the Managing Member pursuant to **Section 3.08(a)**, may deliver to each Exercising Member certificates evidencing the New Securities. Each Exercising Member shall deliver to the Company the purchase price for the New Securities purchased by it by certified or bank check or wire transfer of immediately available funds. Each party to the purchase and sale of New Securities shall take all such other actions as may be reasonably necessary to consummate the purchase and sale including, without limitation, entering into such additional agreements as may be necessary or appropriate.

## ARTICLE X
### TRANSFER

**Section 10.01 General Restrictions on Transfer.**

(a)      Each Member other than the Managing Member acknowledges and agrees that, until the consummation of a Qualified Public Offering, such Member shall not Transfer any Units or Unit Equivalents except as permitted pursuant to **Section** 10.02 or in accordance with the procedures described in **Section 10.03** and **Section 10.04**, as applicable.

(b)      Any Transfer or attempted Transfer of any Units or Unit Equivalents in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the owner of such Units or Unit Equivalents for all purposes of this Agreement.

**Section 10.02 Permitted Transfers.** The provisions of **Section 10.01(a)** and **Section 10.03** (with respect to the Dragging Member only) shall not apply to Transfers by any Member of any of its Units or Unit Equivalents pursuant to a Public Offering.

**Section 10.03 Drag-along Rights.**

(a)      **Participation.** At any time prior to the consummation of a Qualified Public Offering, in the event of a proposed Change of Control (a "**Drag-along Sale**"), the Managing Member (such Member or Members, the "**Dragging Member**") shall, after delivering the Drag-along Notice in accordance with **Section 10.03(b)**, require that each other Member (each, a

34

"**Drag-along Member**") participate in such sale (including, if necessary, by converting their Unit Equivalents into the Units to be sold in the Drag-along Sale) in accordance with **Section 10.03(b)**. The Distribution of the aggregate consideration of such transaction shall be made in accordance with **Section 13.03(c)**.

(b)     **Procedures.** The Dragging Member shall exercise its rights pursuant to this **Section** 10.03 by delivering a written notice (the "**Drag-along Notice**") to the Company and each Drag-along Member no later than five (5) Business Days prior to the anticipated closing date of such Drag-along Sale. The Drag-along Notice shall make reference to the Dragging Members' rights and obligations hereunder and shall describe in reasonable detail the person or entity to whom such Units are proposed to be sold, the number of each class or series of Units to be sold by the Dragging Member, the proposed amount of consideration for the Drag-along Sale and the other material terms and conditions of the Drag-along Sale.  Each Drag-along Member shall execute the purchase agreement, if applicable, and make or provide the same representations, warranties, covenants, indemnities and agreements as the Dragging Member makes or provides in connection with the Drag-along Sale; *provided*, that each Drag-along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents, enforceability of such documents against the Drag-along Member, and other matters relating to such Drag-along Member.  Each Drag-along Member shall pay its pro-rata share of any costs of the transaction that are not otherwise paid by the Company, and costs incurred by any Drag-along Member on such Drag-along Member's own behalf are not treated as costs of the transaction, provided, however, that the Drag-along Members collectively may retain a single legal counsel to represent them in connection with the Drag-along Sale, and the Company shall reimburse the Drag-along Members for the reasonable fees and expenses of such legal counsel up to an aggregate amount not to exceed $20,000.  Each Drag-along Member who is required to participate in a Drag-along Sale must, with respect to any such Drag-along Sale: (i) cooperate fully with the transaction and take all steps reasonably requested by the Dragging Member to effect the transaction,  including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Dragging Member, (ii) consent to and vote in favor of the transaction, and (iii) not exercise any applicable dissenter's, appraisal or like rights with respect to the transaction.

### Section 10.04 Incentive Units Purchase Right.

(a)     **Purchase Right.** Following the termination of employment or other engagement of any Service Provider with the Company or any member of the Management Company Group for any reason, the Company may, within the later of (A) 180 days after such termination, or (B) 180 days after the Company becomes aware of any breach by such terminated Service Provider of any covenant in **Article** XI herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any member of the Management Company Group, but shall not be obligated to, purchase any and all Incentive Units owned by such Service Provider and/or at the following purchase price: (i) in the event of a termination other than a termination for Cause, if such Service Provider has not, prior to the time of any purchase, breached any covenant in **Article** XI herein or under any effective Award Agreement, employment agreement or any

written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any member of the Management Company Group, at a purchase price equal to Fair Market Value, (ii) in the event of a termination other than a termination for Cause, if such Service Provider breaches, prior to the time of any purchase, any covenant in **Article** XI herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any member of the Management Company Group, at a purchase price equal to zero, or (iii) in the event of a termination for Cause, at a purchase price equal to zero.

(b)     **Procedures.**

(i)     If the Company desires to exercise its right to purchase Incentive Units granted to a Service Provider pursuant to this **Section** 10.04, the Company shall deliver to the Service Provider a written notice (the "**Purchase Notice**") within the aforementioned time period set forth in **Section 10.04(a)** specifying the number of Incentive Units to be purchased by the Company (the "**Purchased Incentive Units**") and the purchase price therefor in accordance with **Section 10.04(a)**.

(ii)     Each applicable Service Provider shall, at the closing of any purchase consummated pursuant to this **Section** 10.04, represent and warrant to the Company that:

(A)     such Service Provider has full right, title and interest in and to the Purchased Incentive Units;

(B)     such Service Provider has all the necessary power and authority and has taken all necessary action to sell such Purchased Incentive Units as contemplated by this **Section** 10.04; and

(C)     the Purchased Incentive Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

(iii)     The closing of any sale of Purchased Incentive Units pursuant to this **Section** 10.04 shall take place no later than thirty (30) days following receipt by the Service Provider of the Purchase Notice.  The purchase price for the Purchased Incentive Units shall be paid on the fifth Business Day following the expiration of all covenants applicable to such holder of Purchased Incentive Units in **Article** XI herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any member of the Management Company Group.

(iv)     To the extent that the payment of the purchase price for the Purchased Incentive Units at the time of such closing is not permitted by any credit facility or similar arrangement of the Company or any member of the Management Company Group, the Company may pay such purchase price in installments with simple interest accruing on the unpaid amount of such purchase price at 3% per annum over a period of up to five (5) years.

(c)     **Cooperation.** The Service Provider shall take all actions as may be reasonably necessary to consummate the sale contemplated by this **Section** 10.04, including, without

limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(d)    **Closing.** At the closing of any sale and purchase pursuant to this **Section** 10.04, the Service Provider shall deliver to the Company a certificate or certificates representing the Incentive Units to be sold (if any), accompanied by evidence of transfer and payment of all necessary transfer taxes.

## ARTICLE XI
### COVENANTS

### Section 11.01 Confidentiality.

(a)    Each Member acknowledges that during the term of this Agreement, such Member will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and/or the Management Company Group that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company and/or the Management Company Group treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**"). In addition, each Member acknowledges that: (i) the Company and/or the Management Company Group has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company and/or the Management Company Group with a competitive advantage over others in the marketplace; and (iii) the Company and the Management Company Group would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing their investment in the Company or performing their duties as a Service Provider of the Company or member of the Management Company Group) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during their association or employment with the Company or member of the Management Company Group or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)    Nothing contained in **Section 11.01(a)** shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to other Members; (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this **Section** 11.01 as if a Member; or (vii) to any

37

potential Permitted Transferee in connection with a proposed Transfer of Units from such Member, as long as such Transferee agrees to be bound by the provisions of this **Section 11.01** as if a Member; *provided*, that in the case of clause (i), (ii) or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of **Section 11.01(a)** shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or becomes available to a Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Member and any of its Representatives in compliance with this Agreement; (iii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iv) becomes available to the receiving Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided*, that such source is not known by the recipient of the Confidential Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

**Section 11.02 Other Business Activities.** The parties hereto expressly acknowledge and agree that: (i) Managing Member and the Management Company Group are permitted to have, and may presently or in the future have, investments or other business relationships, ventures, agreements or arrangements with entities engaged in the business of the Company, other than through the Company and the Company Subsidiaries (an "**Other Business**"); (ii) Managing Member and the Management Company Group have or may develop a strategic relationship with businesses that are or may be competitive with the Company and the Management Company Group; (iii) subject to the provisions of **Section 11.01**, none of Managing Member or the Management Company Group will be prohibited by virtue of Managing Member's investment in the Company from pursuing and engaging in any such activities; (iv) none of Managing Member or the Management Company Group will be obligated to inform the Company or any Member of any such opportunity, relationship or investment (a "**Company Opportunity**") or to present any Company Opportunity to the Company, and the Company hereby renounces any interest in a Company Opportunity and any expectancy that a Company Opportunity will be offered to it; (v) subject to the provisions of **Section 11.01**, nothing contained herein shall limit, prohibit or restrict the Managing Member from serving on the board of directors or other governing body or committee of any Other Business; and (vi) the Members will not acquire, be provided with an option or opportunity to acquire, or be entitled to any interest or participation in any Other Business as a result of the participation therein of any of Managing Member or the Management Company Group. The parties hereto expressly authorize and consent to the involvement of Managing Member and/or the Management Company Group in any Other Business; *provided*, that any transactions between the Company and/or the Management Company Group and an Other Business will be on terms no less favorable to the Company and/or the Management Company Group than would be obtainable in a comparable arm's-length transaction. The Management Members hereto expressly waive, to the fullest extent permitted by Applicable Law, any rights to assert any claim that such involvement breaches any fiduciary or other duty or

38

obligation owed to the Company or any Member or to assert that such involvement constitutes a conflict of interest by such Persons with respect to the Company or any Member.

**Section 11.03  Non-compete; Non-solicit.** Each Management Member shall be subject to the following covenants of this **Section** 11.03 unless an effective Award Agreement, employment agreement or other written contract of engagement entered into between the Company or member of the Management Company Group and such Management Member already contains non-competition and non-solicitation provisions, in which case such provisions shall apply in lieu of this **Section** 11.03.

(a) **Non-compete.** In light of each Management Member's access to Confidential Information and position of trust and confidence with the Company, each Management Member hereby agrees that, during the period of the later of (i) three (3) years from the date of this Agreement or (ii) one (1) year following the termination of such Management Member's employment or other engagement with the Company or any member of the Management Company Group, for any reason or no reason (the "**Restricted Period**"), such Management Member shall not (x) engage in or assist others in engaging in the business of any Competitor or any division or business segment of any Competitor, (y) have an interest in any Competitor or any division or business segment of any Competitor in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant, or (z) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company or any member of the Management Company Group and customers or suppliers of the Company or any member of the Management Company Group or cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Company or any member of the Management Company Group (including any existing or former client or customer of the Company or any member of the Management Company Group and any Person that becomes a client or customer of the Company or any member of the Management Company Group during the Restricted Period), or any other Person who has a material business relationship with the Company or any member of the Management Company Group, to terminate or modify any such actual or prospective relationship.

For purposes of this **Section 11.03(a)**, "**Competitor**" means any other Person engaged, directly or indirectly, in whole or in part, in the same or similar business as the Company or any member of the Management Company Group, including those engaged in the business of providing the services of damage consulting and estimating, construction consulting and estimating, insurance claims consulting, property replacement cost appraisals, expert testimony and litigation support, dispute resolution, project monitoring and clerking, water and smoke restoration consulting, construction project scheduling, construction project management, cost and bid package analysis, construction budgeting, builder's risk consulting, construction defect consulting, and construction restoration and analysis.

(b) **Non-solicit of Employees.** In light of each Management Member's access to Confidential Information and position of trust and confidence with the Company, each Management Member further agrees that, during the Restricted Period, he shall not, and shall not permit any of his Affiliates to, directly or indirectly, hire or solicit any employee of the Company or any member of the Management Company Group, or person who was employed by the Company or any member of the Management Company Group during the Restricted Period, or

39

encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees.

(c)     **Non-solicit of Clients.** In light of each Management Member's access to Confidential Information and position of trust and confidence with the Company, each Management Member further agrees that, during the Restricted Period, he shall not, and shall not permit any of his Affiliates to, directly or indirectly, solicit or entice, or attempt to solicit or entice, any clients or customers of the Company or any member of the Management Company Group or potential clients or customers of the Company or any member of the Management Company Group.

(d)     **Blue Pencil.** If any court of competent jurisdiction determines that any of the covenants set forth in this **Section** 11.03, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this **Section** 11.03 or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by Applicable Law. The parties hereto expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

## ARTICLE XII
### ACCOUNTING; TAX MATTERS

**Section 12.01  Tax Matters Member.**

(a)     **Appointment.** The Members hereby appoint the Managing Member as the "**Tax Matters Member**" who shall serve as the "tax matters partner" (as such term is defined in Code Section 6231) for the Company.

(b)     **Tax Examinations and Audits.** The Tax Matters Member is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the Tax Matters Member and to do or refrain from doing any or all things reasonably requested by the Tax Matters Member with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings. Each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company.

(c)     **Income Tax Elections.** The Tax Matters Member shall have sole discretion to make any income tax election it deems advisable on behalf of the Company; *provided*, that the Tax Matters Member will make an election under Section 754 of the Code, if requested in

DB1/ 82337237.6

writing by Members holding a majority of the outstanding Common Units. All determinations as to tax elections and accounting principles shall be made solely by the Tax Matters Member.

(d)     **Tax Returns and Tax Deficiencies.** Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. The Tax Matters Member shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in **Section 7.05(d**).

(e)     **Resignation.** The Tax Matters Member may resign at any time. If the Managing Member ceases to be the Tax Matters Member for any reason, the holders of a majority of the Common Units of the Company shall appoint a new Tax Matters Member.

**Section 12.02 Tax Returns.** At the expense of the Company, the Managing Member (or any Officer that it may designate pursuant to **Section 8.02**) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and the Company Subsidiaries own property or do business. As soon as reasonably possible after the end of each Fiscal Year, the Managing Member or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

**Section 12.03 Company Funds.** All funds of the Company shall be deposited in its name, or in such name as may be designated by the Managing Member, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Managing Member. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Managing Member may designate.

### ARTICLE XIII
#### DISSOLUTION AND LIQUIDATION

**Section 13.01 Events of Dissolution.** The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events:

(a)     The determination of the Managing Member to dissolve the Company;

(b)     An election to dissolve the Company made by holders of a majority of the Common Units;

(c)     The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(d)     The entry of a decree of judicial dissolution under § 18-802 of the Delaware Act.

**Section 13.02 Effectiveness of Dissolution.** Dissolution of the Company shall be effective on the day on which the event described in **Section 13.01** occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in **Section 13.03** and the Certificate of Formation shall have been cancelled as provided in **Section 13.04**.

**Section 13.03 Liquidation.** If the Company is dissolved pursuant to **Section 13.01**, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)     **Liquidator.** The Managing Member, or, if the Managing Member is unable to do so, a Person selected by the holders of a majority of the Common Units, shall act as liquidator to wind up the Company (the "**Liquidator**"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)     **Accounting.** As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)     **Distribution of Proceeds.** The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)     *First*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)     *Second*, to the establishment of and additions to reserves that are determined by the Managing Member in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)     *Third*, to the Members in the same manner as Distributions are made under **Section** 7.02.

(d)     **Discretion of Liquidator.** Notwithstanding the provisions of **Section 13.03(c)** that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in **Section 13.03(c)**, if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion,

42

Distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of **Section 13.03(c)**, undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

> **Section 13.04 Cancellation of Certificate.** Upon completion of the Distribution of the assets of the Company as provided in **Section 13.03(c)** hereof, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

> **Section 13.05 Survival of Rights, Duties and Obligations.** Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to **Section** 14.03.

> **Section 13.06 Recourse for Claims.** Each Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Managing Member, the Liquidator or any other Member.

## ARTICLE XIV
### EXCULPATION AND INDEMNIFICATION

> **Section 14.01 Exculpation of Covered Persons.**

> (a) **Covered Persons.** As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Manager, Officer, employee, agent or representative of the Company.

> (b) **Standard of Care.** No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

> (c) **Good Faith Reliance.** A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to

43

the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Delaware Act.

**Section 14.02  Liabilities and Duties of Covered Persons.**

(a)      **Limitation of Liability.** This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)      **Duties.** Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 14.03  Indemnification.**

(a)      **Indemnification.** To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

DB1/ 82337237.6

(i)      Any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)      The fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Company Subsidiary;

*provided*, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)      **Reimbursement.** The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this **Section** 14.03; *provided*, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this **Section** 14.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)      **Entitlement to Indemnity.** The indemnification provided by this **Section** 14.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this **Section** 14.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this **Section** 14.03 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)      **Insurance.** To the extent available on commercially reasonable terms, the Company shall purchase, at its expense as determined by the Managing Member, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Managing Member may determine; *provided*, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered

Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses. The Company hereby acknowledges that the Covered Persons may have certain rights to indemnification, advancement of expenses and/or insurance provided by the Managing Member or its Affiliates (excluding the Company and its Subsidiaries). The Company hereby agrees, on behalf of itself and its Subsidiaries, (i) that it is an indemnitor of first resort (i.e., its obligations to each of the Covered Persons are primary and any obligation of the Managing Member or its Affiliates to advance expenses or to provide indemnification for the same expenses or liabilities incurred by or on behalf of any of the Covered Persons is secondary), (ii) that it shall be required to advance the full amount of expenses incurred by or on behalf of each of the Covered Persons and shall be liable for the full amount of all Losses to the extent legally permitted and as required by the terms of this Agreement (or, to the extent applicable, the Delaware Act), without regard to any rights such Covered Persons may have against the Managing Member or its Affiliates (including under director and officer insurance policies), and (iii) that it irrevocably waives, relinquishes and releases the Managing Member and its Affiliates from any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Managing Member or its Affiliates on behalf of a Covered Persons with respect to any claim for which a Covered Person has sought indemnification from the Company or any Subsidiary of the Company shall affect the foregoing, and the Managing Member and its Affiliates shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of a Covered Person against the Company or any Subsidiary of the Company. The Company and each of the Covered Persons agree that the Managing Member and its Affiliates are express third-party beneficiaries of the terms of this **Section 14.03(d)**.

(e)     **Funding of Indemnification Obligation.** Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this **Section** 14.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f)     **Savings Clause.** If this **Section** 14.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this **Section** 14.03 to the fullest extent permitted by any applicable portion of this **Section** 14.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g)     **Amendment.** The provisions of this **Section** 14.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this **Section** 14.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this **Section** 14.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

46

**Section 14.04 Survival.** The provisions of this **Article** XIV shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XV
### MISCELLANEOUS

**Section 15.01 Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 15.02 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 15.03 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section** 15.03):

If to the Company:          J.S. Held Management LLC
                            c/o Lovell Minnick Partners LLC
                            2141 Rosecrans Avenue, Suite 5150
                            El Segundo, CA 90245
                            E-mails:  jnewcom@lovellminnick.com
                                      rbelke@lovellminnick.com
                            Attention: Managing Director

with a copy to:             Morgan, Lewis & Bockius LLP
                            1701 Market Street
                            Philadelphia, PA 19103
                            Facsimile:     215.963.5001
                            E-mail: bshander@morganlewis.com
                            Attention: Barbara J. Shander

If to Managing Member:      Lovell Minnick Partners LLC

47

2141 Rosecrans Avenue, Suite 5150
El Segundo, CA 90245
E-mails:  jnewcom@lovellminnick.com
                rbelke@lovellminnick.com
Attention: Managing Director

with a copy to:                 Morgan, Lewis & Bockius LLP
                                1701 Market Street
                                Philadelphia, PA 19103
                                Facsimile:     215.963.5001
                                E-mail: bshander@morganlewis.com
                                Attention: Barbara J. Shander

If to a Management Member, to such Management Member's respective mailing address as set forth on the Members Schedule.

**Section 15.04  Headings.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

**Section 15.05  Severability.** If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Subject to **Section 11.03(d)**, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 15.06  Entire Agreement.**

(a)      This Agreement, together with the Certificate of Formation, the Incentive Plan, each Award Agreement, and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

(b)      In the event of an inconsistency or conflict between the provisions of this Agreement and any provision of the Incentive Plan or an applicable Award Agreement with respect to the subject matter of the Incentive Plan or Award Agreement, the Managing Member shall resolve such conflict in its sole discretion.

**Section 15.07  Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**Section 15.08 No Third-party Beneficiaries.** Except as provided in **Article** XIV, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 15.09 Amendment.**

(a)     No provision of this Agreement may be amended or modified except by a writing executed and approved by the Managing Member; *provided*, that (i) any amendment, alteration, supplement, modification or waiver modifying the rights or obligations of any Member holding Class A Common Units that is materially and disproportionately adverse to such Member relative to the rights of other Members holding Class A Common Units, shall, in each case, require the written consent of such Member and (ii) any amendment, alteration, supplement, modification or waiver modifying the rights or obligations of any Member holding Class B Common Units that is materially and disproportionately adverse to such Member relative to the rights of other Members holding Class B Common Units, shall, in each case, require the written consent of such Member.

(b)     Any amendment in accordance with **Section 15.09(a)** shall be binding upon each Member and the Company.

(c)     The Managing Member may amend this Agreement without the consent of any Member (i) to reflect changes validly made in the Members or the Managing Member and corresponding changes in the terms and provisions of this Agreement necessary to reflect or conform with any such change in the Members or the Managing Member, (ii) to reflect changes permitted in accordance with this Agreement in the Capital Accounts or the Membership Interests of the Members or (iii) to clarify any ambiguities herein or to appropriately adjust any mechanics or procedures set forth herein so long as the rights of the Members are not prejudiced (in more than an insignificant manner) thereby.

(d)     Anything in the foregoing provisions of this **Section 15.09** to the contrary notwithstanding, this Agreement may be amended from time to time in each and every manner deemed necessary or appropriate by the Managing Member to comply with the then existing requirements of the Code and the Treasury Regulations affecting the Company or any other provision of applicable law or regulation.

(e)     Without limiting the provisions of **Section 15.09(a)** above, the Managing Member shall be entitled to amend, amend and restate, or authorize the amendment, or amendment and restatement of, the Certificate of Formation from time to time to reflect any action, matter or change (whether an amendment to this Agreement or otherwise) approved by the Managing Member.

**Section 15.10 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by

any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this **Section 15.10** shall diminish any of the explicit and implicit waivers described in this Agreement, including in **Section 4.07(f)**, **Section 9.01(d)**, **Section 10.03(a)**, **Section 11.02**, **Section 14.02(a)**, **Section 14.03(d)**, and **Section 15.13** hereof.

**Section 15.11 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**Section 15.12 Submission to Jurisdiction.** The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in **Section** 15.03 shall be effective service of process for any suit, action or other proceeding brought in any such court.

**Section 15.13 Waiver of Jury Trial.** Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 15.14 Equitable Remedies.** Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable

relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 15.15  Remedies Cumulative.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in **Section** 14.02 to the contrary.

**Section 15.16  Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 15.17  Initial Public Offering.**

(a)  **Initial Public Offering.** If at any time the Managing Member desires to cause (i) a Transfer of all or a substantial portion of (x) the assets of the Company or (y) the Units to a newly organized corporation or other business entity (an "**IPO Entity**"), (ii) a merger or consolidation of the Company into or with a IPO Entity as provided under § 18-209 of the Delaware Act or otherwise, or (iii) another restructuring of all or substantially all the assets or Units of the Company into an IPO Entity, including by way of the conversion of the Company into a Delaware corporation as provided under § 18-216 of the Delaware Act (any such corporation also herein referred to as an "IPO Entity"), in any such case in anticipation of or otherwise in connection with an Initial Public Offering of securities of an IPO Entity or its Affiliate (an "**Initial Public Offering**"), each Member shall take such steps to effect such Transfer, merger, consolidation, conversion or other restructuring as may be reasonably requested by the Managing Member, including, without limitation, executing and delivering all agreements, instruments and documents as may be reasonably required and Transferring or tendering such Member's Units to an IPO Entity in exchange or consideration for shares of capital stock or other equity interests of the IPO Entity, determined in accordance with the valuation procedures set forth in **Section 15.17(b)**.

(b)  **Fair Market Value.** In connection with a transaction described in **Section 15.17(a)**, the Managing Member shall, in good faith but subject to the following sentence, determine the Fair Market Value of the assets and/or Units Transferred to, merged with or converted into shares of the IPO Entity, the aggregate Fair Market Value of the IPO Entity and the number of shares of capital stock or other equity interests to be issued to each Member in exchange or consideration therefor. In determining Fair Market Value, (i) the offering price of the Initial Public Offering shall be used by the Managing Member to determine the Fair Market Value of the capital stock or other equity interests of the IPO Entity and (ii) the Distributions that the Members would have received with respect to their Units, including Incentive Units, if the Company were dissolved, its affairs wound up and Distributions made to the Members in accordance with **Section 13.03(c)** shall determine the Fair Market Value of the Units. In addition, any Units (including Incentive Units) to be converted into or redeemed or exchanged for shares of the IPO Entity shall receive shares with substantially equivalent economic,

governance, priority and other rights and privileges as in effect immediately prior to such transaction (disregarding the tax treatment of such transaction).

(c)     **Appointment of Proxy.** Each Member hereby makes, constitutes and appoints the Company, with full power of substitution and resubstitution, its true and lawful attorney, for it and in its name, place and stead and for its use and benefit, to act as its proxy in respect of any vote or approval of Members required to give effect to this **Section** 15.17, including any vote or approval required under § 18-209 or § 18-216 of the Delaware Act. The proxy granted pursuant to this **Section 15.17(c)** is a special proxy coupled with an interest and is irrevocable.

(d)     **Lock-up Agreement.** Each Member hereby agrees that in connection with an Initial Public Offering, and upon the request of the managing underwriter in such offering, such Member shall not, without the prior written consent of such managing underwriter, during the period commencing three days prior to the effective date of such registration and until the date specified by such managing underwriter (such period not to exceed 180 days in the case of an Initial Public Offering or 90 days in the case of any registration other than an Initial Public Offering), (i) offer, pledge, sell, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, hedge the beneficial ownership of or otherwise dispose of, directly or indirectly, any Units or Unit Equivalents (including any equity securities of the IPO Entity) (whether such Units or Unit Equivalents or any such securities are then owned by the Member or are thereafter acquired), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Units or Unit Equivalents (including equity securities of the IPO Entity) or such other securities, in cash or otherwise. The foregoing provisions of this **Section 15.17(d)** shall not apply to sales of securities to be included in such Initial Public Offering or other offering if otherwise permitted. Each Member agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the managing underwriter which are consistent with the foregoing or which are necessary to give further effect thereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

**J.S. HELD MANAGEMENT LLC**

By: J.S. Held Holdings IV-A LLC
Its: Managing Member

By: Lovell Minnick Equity Advisors IV LP
Its: Managing Member

By: Fund IV UGP LLC
Its: General Partner

By: Lovell Minnick Partners LLC
Its: Managing Member

By _____
Name: Jennings J. Newcom
Title: Managing Director

[Signature Page to Limited Liability Company Agreement]

**Managing Member:**

**J.S. HELD HOLDINGS IV-A LLC**

By: Lovell Minnick Equity Advisors IV LP
Its: Managing Member

By: Fund IV UGP LLC
Its: General Partner

By: Lovell Minnick Partners LLC
Its: Managing Member

By _____
Name: Jennings J. Newcom
Title: Managing Director

[Signature Page to Limited Liability Company Agreement]

**EXHIBIT A**

**FORM OF JOINDER AGREEMENT**

## JOINDER AGREEMENT

Reference is hereby made to the Limited Liability Company Agreement, dated [DATE], as amended from time to time (the "**LLC Agreement**"), among [EXISTING MEMBERS] and J.S. Held Management LLC, a company organized under the laws of Delaware (the "**Company**"). Pursuant to and in accordance with Section 4.01(b) of the LLC Agreement, the undersigned hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement and agrees that upon execution of this Joinder, such Person shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto [, and shall hold the status of [MEMBERSHIP CLASS]].

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the LLC Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of [DATE].

[NEW MEMBER]

By_____

Name:

Title: