DocuSign Envelope ID: 40E41B60-795A-409F-877F-FA9BC9DD9C73

EXECUTION

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement"), is entered into as of this 25th day of September, 2020, by and between J.S. Held LLC (the "Company"), and Tracey Dodd, an individual ("Employee").

**WHEREAS**, Employee and J.S. Held LLC are parties to that certain Employment Agreement dated as of the 29th day of September, 2016 (the "Original Employment Agreement");

**WHEREAS**, Employee and the Company desire to terminate the Term of the Original Employment Agreement and to enter into this Agreement, effective as of the date hereof, to set forth and govern the terms and conditions of Employee's employment with the Company from and after the date hereof; and,

**WHEREAS**, Employee is a Member of the Company and has executed a joinder agreement to that certain Second Amended and Restated Limited Liability Company dated as of July 15, 2019 (the "Operating Agreement") of Watchtower Topco, LLC ("Topco").

**NOW, THEREFORE,** in consideration of the premises and of the respective representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1. Employment.**

(a) During the Term, the Company hereby agrees to continue to employ Employee, and Employee hereby agrees to continue such employment, as Executive Vice President for the Company, with such duties and responsibilities as shall be as set forth by the Company. The Company may modify Employee's duties or assign new duties to the Employee to the extent necessary to meet the Company's business goals. Employee shall report directly to the Chief Executive Officer of the Company (the "CEO") or his designee(s). Employee shall devote all of her business time, attention, and efforts to the performance of Employee's duties hereunder. Employee shall faithfully adhere to, execute, and fulfill all lawful and reasonable policies established by the Company.

(b) During the Term, as consideration for the services performed by Employee, the Company shall pay Employee a base salary, which is subject to annual adjustment, at the annual rate of $336,025.92 ("Base Salary"), payable in installments at such times as the Company customarily pays its other executives (but in any event no less often than monthly). In addition to her Base Salary, commencing on the date hereof, Employee shall be eligible to receive a bonus (the "Bonus") of $150,000 per year, $50,000 of which will be payable by October 31, 2020. Bonuses in general are payable as determined by, and subject to annual adjustment by, the Company in its sole discretion. Such Bonus shall be payable within 45 days of the end of the calendar year so long as Employee remains employed by the Company on such payment date. The Company may modify the terms of any Bonus and the timing of payment thereof so long as such modifications are consistent with terms applicable to similarly situated employees in comparable roles. So long as Employee remains employed by the Company, the Company will provide benefits to Employee no less favorable than those benefits made available generally to similarly situated employees of the Company. The Company may withhold from any amounts payable under this Agreement such federal, state, and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(c) Employee shall be entitled to paid leave annually accrued consistent with past practices and similarly situated employees in comparable roles. The Company agrees to reimburse Employee for all reasonable business travel and other out-of-pocket expenses incurred by Employee in the discharge of Employee's duties hereunder, subject to the Company's reimbursement policies in effect from time to time. All reimbursable expenses shall be appropriately documented in reasonable detail by Employee upon submission of any request for reimbursement, and in a format

{B1699583.1}

1

and manner consistent with the Company's expense reporting policy, as may be in effect from time to time, as well as applicable federal and state record keeping requirements.

(d) The Company and the Employee hereby agree and acknowledge that the Original Employment Agreement is terminated and shall be of no further force and effect (except to the extent any provisions survive pursuant to the terms of the Original Employment Agreement, and excluding those terms that are superseded by the provisions contained herein).

(e) The Company has a Diversity and Inclusion Council (the "Council") which Council is currently chaired by the CEO. Employee shall report to the chair of the Council for all matters relating to the Council and Employee shall be a member of the Council. The Employee shall work with the chair of the Council and its members to develop goals and criteria that are consistent with the Company's continuing promotion of an inclusive and diverse workplace environment.

**2. Term; Termination.**

(a) This Agreement and Employee's employment are effective as of the date hereof and shall continue until terminated by either party in accordance with the terms and conditions set forth herein (the "Term"). Notwithstanding anything to the contrary contained herein, Employee's employment with the Company may be terminated by the Company or Employee for any reason or no reason at all, with or without Cause, and without prior notice provided that Employee shall provide the Company with two weeks' notice of any termination subject to the provisions contained herein.

(b) In the event that the Company terminates Employee's employment without Cause (as defined below) or if Employee terminates her employment with Good Reason (as defined below), Employee shall be entitled to receive the Severance Payment (as defined below); provided, however, that Employee's receipt of the Severance Payment is expressly conditioned on Employee's execution and non-revocation of a general release and waiver of any and all claims against the Company arising out of her employment or termination thereof in form and substance specified by and acceptable to the Company (the "Separation Release"). The Salary Portion (as defined below) of the Severance Payment will be paid to in accordance with the Company's normal payroll practices in effect at the time of termination, provided that Employee has executed, submitted to the Company, and not revoked the Separation Release and the revocation period for the Separation Release has expired.

"Severance Payment" means: twelve (12) months (the "Severance Period") of Employee's Base Salary at the rate in effect as of Employee's separation date (such amount, the "Salary Portion") and (B) continued coverage by the Company of Employee, her spouse and eligible dependents on its medical, to the extent covered under such plans immediately prior to Employee's termination date, for the duration of the Severance Period, at the same premium rates that are charged to current employees receiving the same coverage; provided that (i) such continuation coverage shall cease to apply if Employee does not pay the applicable monthly premiums, (ii) the COBRA continuation period shall run currently with the Severance Period, so that, for such continuation coverage benefit to apply, Employee must elect COBRA continuation coverage at the time of her termination of employment, and (iii) in the event that the Company determines in its discretion that it is not practicable or possible to continue to provide such medical benefits, the Company shall reimburse Employee for the cost of replacing such benefits on an after-tax basis.

Notwithstanding anything contained in this Agreement, the Company shall have no obligation to make (or continue to make) any Severance Payment to Employee in the event Employee: (i) terminates her employment without Good Reason, (ii) breached or breaches, at any time prior to or after termination of employment, any covenant in this Agreement, or any covenant undertaken under the Watchtower Management Holdco, LLC's Second Amended and Restated Limited Liability Company Agreement as currently in effect or any effective equity award or grant agreement or any other written agreement with the Company or any of its affiliates, (iii) is terminated by the Company for Cause; or, (iv) fails to deliver or revokes a general release as provided in Section 2(b) within forty five (45) days following receipt of such release from the Company.

(c) "Cause" shall mean (i) any willful material breach of this Agreement by Employee

or willful misconduct by Employee, however, in either case, after written notice thereof is given to Employee and Employee shall fail to cure or take reasonable steps to commence to cure such conduct within thirty (30) days of receipt of such notice; (ii) Employee's fraud, embezzlement or other material dishonesty or breach of fiduciary duty against the Company or any of the Company subsidiaries as determined by the Company; (iii) any conviction of, or the entering of a plea of guilty or nolo contendere to, a crime that constitutes a felony (or any state-law equivalent) or that involves moral turpitude, or any willful or material violation by Employee of any federal, state or foreign securities laws; (iv) any conviction of any other criminal act or act of material dishonesty, disloyalty or misconduct by Employee; (v) the use (including being under the influence) or possession of illegal drugs by Employee on the premises of the Company or any of the Company subsidiaries or while performing any duties or responsibilities with the Company or any of the Company subsidiaries; or (vi) any action by Employee which would reasonably be expected to materially impair or damage the reputation of the Company and which continues after written notice thereof is given to Employee and Employee shall fail to cure or take reasonable steps to commence to cure such action within thirty (30) days of receipt of such notice.

(d) "Good Reason" shall mean the following actions by the Company (i) a material adverse alteration in the nature or status of the Employee's title, duties, or responsibilities, the assignment of duties or responsibilities, or a reduction in Employee's Base Salary; in each case inconsistent with similarly situated employees in comparable roles; (ii) the relocation of Employee's primary office by Company to any place exceeding a distance of twenty-five (25) miles from the Employee's office at the time this Agreement was executed, except for voluntary moves by Employee or allowing the Employee to work remotely, or reasonably required travel by the Employee on the Company's business; or (iii) any material breach by the Company of any provision of this Agreement that remains uncured after delivery of written notice to the Company within thirty (30) days of any such breach and a period of thirty (30) days for Company to cure such breach.

(e) In the event of the death of Employee during the term of Employee's employment with the Company, this Agreement shall automatically terminate, and the Company shall have no further obligations hereunder except as provided in **Section 2(f).**

(f) Subject to **Section 2(b),** in the event of the death of Employee during the Severance Period, Employee's estate or personal representative, as applicable, shall be entitled to receive the unpaid Salary Portion of Employee's Severance Payment in a single lump-sum payment made within sixty (60) days after the Employee's death.

(g) Upon termination of this Agreement, Employee (or Employee's estate or personal representative, as applicable) shall be entitled to receive (i) all of Employee's accrued but unpaid Base Salary through the effective date of termination, whereafter no further Base Salary shall accrue, and (ii) reimbursement of any proper expenses in accordance with **Section 1(c).**

(h) Further, upon a termination of this Agreement by the Company without Cause or by the Employee for Good Reason, (i) any and all unvested Restricted Common Units shall immediately vest; and, (ii) the Company shall effectuate the purchase any and all vested Common Units owned by the Employee for the Fair Market Value of such Common Units.

(i) Upon the termination of this Agreement by the Company for Cause or by the Employee without Good Reason, there shall be no acceleration of unvested units and the Company shall effectuate the purchase any and all vested Common Units owned by the Employee as of such date for the Fair Market Value of such Common Units.

3. **Withholding Taxes.** The Company may withhold from any amounts payable under this Agreement such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation. Employee shall bear all expense of, and shall be solely responsible for, any and all taxes associated with the compensation and benefits provided under this Agreement.

4. **Section 409A of the Code.**

(a) <u>General</u>. Notwithstanding the other provisions hereof, this Agreement is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("<u>Section 409A</u>"), to the extent applicable, and shall be interpreted to avoid any penalty sanctions under Section 409A. Accordingly, all provisions herein, or incorporated by reference, shall be construed and interpreted to comply with Section 409A and, if necessary, any such provision shall be deemed amended to comply with Section 409A and regulations thereunder. If any payment or benefit cannot be provided or made at the time specified herein without incurring sanctions under Section 409A, then such benefit or payment shall be provided in full at the earliest time thereafter when such sanctions will not be imposed. All payments to be made upon a termination of employment under this Agreement that are deferred compensation may only be made upon a "separation from service" under Section 409A. For purposes of Section 409A, each payment made under this Agreement shall be treated as a separate payment. In no event may Employee, directly or indirectly, designate the calendar year of payment.

(b) <u>Payment Delay</u>. To the maximum extent permitted under Section 409A, the Severance Payment payable under this Agreement is intended to comply with the "short-term deferral exception" under Treas. Reg. §1.409A-1(b)(4), and any remaining amount is intended to comply with the "separation pay exception" under Treas. Reg. §1.409A-1(b)(9)(iii); provided, however, any amount payable to Employee during the six (6) month period following Employee's last day of employment with the Company that does not qualify within this exception and constitutes deferred compensation subject to the requirements of Section 409A shall hereinafter be referred to as the "**Excess Amount**." If at the time of Employee's separation from service, the Company's (or any entity required to be aggregated with the Company under Section 409A) stock is publicly-traded on an established securities market or otherwise and Employee is a "specified employee" (as defined in Section 409A and determined in the sole discretion of the Company (or any successor thereto) in accordance with the Company's (or any successor thereto) "specified employee" determination policy), then the Company shall postpone the commencement of the payment of the portion of the Excess Amount that is payable within the six (6) month period following Employee's last day of employment with the Company (or any successor thereto) for six (6) months following Employee's last day of employment with the Company (or any successor thereto). The delayed Excess Amount shall be paid in a lump sum to Employee within thirty (30) days following the date that is six (6) months following Employee's last day of employment with the Company (or any successor thereto) and any amounts payable after such six (6) month period shall be paid in accordance with its original schedule. If Employee dies during such six (6) month period and prior to the payment of the portion of the Excess Amount that is required to be delayed on account of Section 409A, such Excess Amount shall be paid to the personal representative of Employee's estate within sixty (60) days after Employee's death.

(c) <u>Reimbursement</u>s. All reimbursements provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during Employee's lifetime (or during a shorter period of time specified in this Agreement), (ii) the amount of expenses eligible for reimbursement during a calendar year may not affect the expenses eligible for reimbursement in any other calendar year, (iii) the reimbursement of an eligible expense will be made on or before the last day of the taxable year following the year in which the expense is incurred, and (iv) the right to reimbursement is not subject to liquidation or exchange for another benefit.

5. **Certain Representations and Warranties of Employee.** Employee represents and warrants that Employee is entering into this Agreement voluntarily and that Employee's employment hereunder and compliance with the terms and conditions of this Agreement will not conflict with, or result in a breach of, any agreement to which Employee is a party or by which Employee may be bound, or any legal duty that Employee owes or may owe to another.

6. **Restrictive Covenants.**

(a) Employee acknowledges that during her employment with the Company, she will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Company subsidiaries and their affiliates that are not generally known to the public, including, but not limited to, information concerning business plans,

financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information"). In addition, Employee acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which Employee is subject, no Employee shall, directly or indirectly, disclose or use (other than solely for the purposes of Employee monitoring and analyzing her investment in the Company or performing her duties as a manager, officer, employee, consultant or other service provider of the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during her association or employment with the Company or thereafter, any Confidential Information of which Employee is or becomes aware. To the extent Employee is in possession of Confidential Information, Employee shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b) Nothing contained in this **Section 6** shall prevent Employee from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over Employee; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; and (iv) to the extent necessary in connection with the exercise of any remedy hereunder; *provided,* that in the case of clause (i), (ii) or (iii), Employee shall notify the Company of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c) In light of Employee's access to Confidential Information and position of trust and confidence with the Company, Employee hereby agrees that (i) for the period that Employee provides any services to the Company or any of its affiliates, (ii) for a period of one (1) year following the termination of Employee's employment with the Company or any of its subsidiaries or affiliates by the Employee for no reason or by the Company for Cause, (iii) at any time while any severance is being paid by the Company to the Employee (in each case known as the "Restricted Period"), Employee shall not, and shall cause her affiliates not to, directly or indirectly, in any capacity, (i) engage in or assist others in engaging in any Restricted Business (defined below) or any division or business segment of any person engaged in any Restricted Business; or (ii) have an interest in any Restricted Business or any division or business segment of any person engaged in any Restricted Business in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant, during the Restricted Period, or any other person who has a material business relationship with the Company or any of its subsidiaries or affiliates, to terminate or modify any such actual or prospective relationship. "Restricted Business" means the business as conducted by the Company from time to time, including providing the services of damage consulting and estimating, construction consulting and estimating, insurance claims consulting, property replacement cost appraisals, expert testimony and litigation support, dispute resolution, project monitoring and clerking, water and smoke restoration consulting, surety services, construction engineering, construction project scheduling, construction project management, cost and bid package analysis, construction budgeting, builder's risk consulting, construction defect consulting, construction restoration and analysis and risk management, health and safety compliance and consulting, disaster recovery and environmental assessments. It is recognized that, following the date hereof, the Restricted Business is expected to be conducted throughout the world, (including the following parishes in the State of Louisiana: Acadia, Allen Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, Lafayette, Lafourche, La Salle, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines,

Point Coupee, Rapides, Red River, Richland, Sabine, Saint Bernard, Saint Charles, Saint Helena, Saint James, Saint John the Baptist, Saint Landry, Saint Martin, Saint Mary, Saint Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermillion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana and Winn) (the "Territory") and that more narrow geographical limitations of any nature on this noncompetition covenant (and the non- solicitation covenant set forth in **Section 6(d))** are therefore not appropriate.

(d) In light of Employee's access to Confidential Information and position of trust and confidence with the Company, Employee further agrees that, during her Employment and during the Restricted Period, she shall not, and shall cause her affiliates not to, directly or indirectly, in any capacity, (A) hire or solicit, or attempt to hire or solicit, any employee of the Company or any of its subsidiaries or affiliates, or person who was employed by the Company or any of its subsidiaries or affiliates at any time during such period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees (B) solicit or entice, or attempt to solicit or entice, or do business with, any clients or customers of the Company or any of its subsidiaries or affiliates or potential clients or customers of the Company or any of its subsidiaries or affiliates or (C) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company or any of its subsidiaries or affiliates and customers or suppliers of the Company or any of its subsidiaries or affiliates, or cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Company or any of its subsidiaries or affiliates (including any existing or former client or customer of the Company or any of its subsidiaries or affiliates and any person that becomes a client or customer of the Company or any of its subsidiaries or affiliates.

(e) From and after the date hereof, Employee shall not, and shall cause her affiliates not to, directly or indirectly, in any capacity, disparage, defame or discredit the Company or any of its subsidiaries or affiliates or any of their respective officers, directors, employees, or advisors (collectively, the "Company Group") or its or their businesses or reputations, or engage in any activity that would have the effect of disparaging, defaming or discrediting the Company Group, nor shall Employee interfere with or disrupt the business activities of the Company Group, or engage in any activity that would have the effect of interfering with or disrupting the business activities of the Company Group.

(f) The restrictive covenants contained herein shall supersede any and all other restrictive covenants, including without limitation any noncompetition or nonsolicitation provisions, as may be applicable by and between the Company and the Employee. For clarification purposes hereunder, the restrictive covenants contained herein shall expressly supersede any and all of those contained in the Operating Agreement of Topco.

**7.** **Invention Assignment.**

(a) Employee agrees to promptly and fully disclose to the Company any and all inventions, original works of authorship, findings, conclusions, data, discoveries, developments, concepts, improvements, trade secrets, patent, copyright or similar laws (collectively, "Inventions").

(b) Employee hereby assigns, transfers and conveys to the Company all of Employee's right, title and interest in and to any and all Inventions that Employee may solely or jointly conceive, develop or reduce to practice, or cause to be conceived, developed or reduced to practice, in the performance of the services under this Agreement or that result, to any extent, from the use of the Company's premises or property, including but not limited to all patent rights, copyrights, trademarks, know-how and trade secrets and rights to apply for the same. Upon request and at the expense of the Company, Employee shall execute and deliver any and all instruments and documents and take such other acts as may be necessary or desirable to document the assignment and transfer described in this **Section 7** or to enable the Company to secure the rights relating thereto.

(c) Employee shall have no obligation to assign to the Company any Invention for which no equipment, supplies, facilities or Confidential Information was used and which was developed entirely on Employee's own time, unless (i) the Invention relates to the business of any of the Company Group, (ii) the Invention relates to actual or demonstrably anticipated research or

DocuSign Envelope ID: 40E41B60-795A-409F-877F-FA9BC9DD9C73

development work of any of the Company Group, or (iii) the Invention results from any work performed by Employee for the Company.

(d) Employee hereby represents and warrants that as of the date of the execution of this Agreement, Employee does not have any rights in any Invention.

**8.** **Notices.** For the purposes of this Agreement, any notice or demand hereunder to or upon any party hereto required or permitted to be given or made shall be deemed to have been duly given or made for all purposes if (a) in writing and sent by (i) messenger or an overnight courier service, or (ii) certified or registered mail, postage paid, return receipt requested, or (b) sent by telefax, telex, an attachment to an electronic mail message in "pdf" or similar format, or similar electronic means, to such party at the following address:

> To Employee: the last known address of Employee contained in the personnel records of the Company.
>
> To the Company:
>
> > J.S. Held LLC
> > 50 Jericho Quadrangle, Suite #117
> > Jericho, NY 11753
> > Attention: Chief Executive Officer

or, in the case of either party, as applicable, to such other names or addresses as the Company or Employee, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section.

**9.** **Severability; Assignment.**

(a) If any portion of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, such portion shall be deemed deleted as though it had never been included herein, but the remainder of this Agreement shall remain in full force and effect.

(b) This Agreement (i) shall not be assignable by Employee without the prior written consent of the Company except pursuant to the laws of descent and distribution and then only for purposes of enforcing Employee's rights under **Sections 2(e) and 4** and (ii) shall be assignable by the Company only with the consent of Employee, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that the Company may assign its rights and obligations under this Agreement without consent of Employee in the event that the Company shall effect a reorganization or consolidate or merge with, sell all or substantially all of its equity or assets to, or enter into any other transaction with, any other entity, including, without limitation, its rights under **Section 6** (Restrictive Covenants) and **Section 7** (Invention Assignment).

**10.** **Cooperation With Regard to Litigation; Waiver of Trial By Jury.**

(a) Employee agrees to cooperate with the Company during the Term of this Agreement and thereafter (including following Employee's termination of employment for any reason) by making himself or herself reasonably available to testify on behalf of the Company or its affiliates, in any action, suit or proceeding, whether civil, criminal, administrative, or investigative, and to assist the Company or any of its affiliates in any such action, suit, or proceeding by providing information and meeting and consulting with its counsel and representatives. Employee shall be fully reimbursed for any out-of-pocket expenses reasonably incurred by Employee in the course of such cooperation.

(b) Each of the parties to this Agreement irrevocably and unconditionally waives the right to a trial by jury in any action, suit or proceeding arising out of, connected with or relating to this Agreement, the matters contemplated hereby, or the actions of the parties in the negotiation, administration, performance or enforcement of this Agreement.

{B1699583.1}

**11.** **No Waiver.** The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

**12.** **Successors; Binding Agreement.** This Agreement shall inure to the benefit of and be binding upon the Company, its successors and permitted assigns. This Agreement shall also inure to the benefit of and be binding upon Employee, Employee's executors, administrators and heirs.

**13.** **No Third Party Beneficiaries.** Nothing contained in this Agreement, whether express or implied, is intended, or shall be deemed, to create or confer any right, interest or remedy for the benefit of any person other than as otherwise provided in this Agreement.

**14.** **Entire Agreement.** This Agreement and any Separation Release executed pursuant to **Section 2(b)** of this Agreement supersede all prior employment or other agreements, negotiations or understandings of any kind with respect to the subject matter hereof and contain the entire understanding between the parties hereto with respect to the subject matter hereof. Any representation, premise or condition, whether written or oral, not specifically incorporated herein, shall have no binding effect upon the parties.

**15.** **Headings.** The headings contained in this Agreement are included for convenience and reference purposes only and shall be given no effect in the construction or interpretation of this Agreement.

**16.** **Amendments.** No modification, termination or waiver of any provision of this Agreement shall be valid unless it is in writing and signed by the party against whom the same is sought to be enforced.

**17.** **Survival.** To the extent consistent with their terms, the covenants in **Sections 2, 3, 6, 7, 9, 10, 11 and 16** hereof shall survive the termination or expiration of this Agreement and the termination of Employee's employment hereunder.

**18.** **Counterparts.** This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

[Signatures on the Following Page]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

Employee:  *Tracey Dodd*  
Tracey Dodd

Company. J.S. Held LLC  
By: *Jonathon C. Held*  
Jonthon Held/CEO

DocuSign Envelope ID: 40E41B60-795A-409F-877F-FA9BC9DD9C73

# Exhibit A

- Act as a subject matter expert, key client contact, and resource for large complex claims.
- Work with Practices and staff to coordinate on claims in which you are is the lead client contact.
- Work with Practice and Regional Leads and Business Development to develop protocol for reaction to client service issues and problems.
- Engage as an expert testifier, speaker and publisher.
- Help Drive revenue, profitability and delivery of services on projects, and as it relates to the practice, business, specifically identified clients and/or those situated in a specific geographical region.
- Be proactive in providing clients with strategic guidance, thought leadership and ideas that will help clients achieve their business objectives, including working with BD and Learning & Development to develop client driven initiatives for training and development of their staff.
- Partner with Leaning & Development to identify technically based professional development paths for internal stakeholders.
- Work with Regional Leads to deliver an enhanced level of client service.
- Collaborate with J.S. Held colleagues across offices, identifying and promoting best practices, recommending appropriate solutions, and ensuring that J.S. Held delivers the best possible product to clients with impeccable service and professionalism
- Collaborate with the CMO, Business Development and related to identify opportunities to
- Partner with Practice Areas, Regional Leads, and Area Leads to promote, present, sell and deliver J.S. Held services so as to provide exceptional creative and transformational client experiences that exceed their expectations  .
- Understanding the client's business so as to ensure that J.S. Held is providing the highest level of innovative strategic thinking and creativity to aid the client in meeting their business objectives.
- Identify opportunities for additional engagement with clients across all Practice Groups
- Work with the Marketing Team, engage clients, attend events and develop opportunities for market expansion.

{B1699583.1}